77279. IN THE INTEREST OF K. E. B.
(378 SE2d 171)

McMURRAY, Presiding Judge.

This appeal is from an order terminating the parental rights of the mother and father of K. E. B., a two-year-old child.

K. E. B.'s mother is 17 years of age and is unemployed. The father is 35 years of age, is afflicted with "muscular dystrophy"[1] and is receiving Social Security disability benefits due to his handicap.

During the evening of July 26, 1986, K. E. B.'s parents brought the child, who was then four months old, to "the emergency room at Habersham Medical Center. . . . The mother stated that there was an acute onset of nausea and vomiting that day [and that the] child was not eating well." A physical examination revealed that K. E. B. "was alert, was without significant physical findings, including any

---

[1] Muscular dystrophy is "a group of genetically determined, painless, degenerative myopathies characterized by weakness and atrophy of muscle without involvement of the nervous system. There are three main types: pseudohypertrophic muscular dystrophy, Landouzy-Déjerine dystrophy, and limb-girdle muscular dystrophy. Rarer forms are distal muscular dystrophy, ocular myopathy, and myotonic dystrophy." Dorland's Illustrated Medical Dictionary (25th ed.) p. 488. The structural and functional changes associated with the various forms of muscular dystrophy are marked by varying degrees of physical disability and bear heavy on the victim's ability to lead a normal and physically independent life. Dorland's Illustrated Medical Dictionary (25th ed.), supra.

significant bruises that were evident or noted or any obvious injuries. She was noted to have a soft abdomen, normal bowel sounds, did not vomit during the stay in ER, and in fact was able to take some fluids there and was diagnosed as having acute viral gastroenteritis and discharged home to be followed by a private physician."

Two days later, "the child was brought without warning to the emergency room at 2:25 p.m. [by the] Baldwin Police Department" and it was noted by the emergency room physician that the child was "having difficulty breathing [and was] pale, lifeless, with some slight attempts to cry." The treating physician also noticed that "[t]he child had bruising to the [right] cheek[, but] no other outward signs of injury. . . ." A closer physical examination revealed that K. E. B. had "difficult raspy respiration at about 30 per minute. There was some gasping. Her skin was cool and dry. Temperature was subnormal at 95. Pulse was 83, [about half what it should be, and it was] barely palpable in the femoral regions. There was no detectable blood pressure by standard measuring techniques." In short, K. E. B. was in "shock."

A team of physicians acted rapidly and were successful in restoring K. E. B.'s respiration, heartbeat and blood pressure. "[T]here were chest X-rays performed on the child as well as skull X-rays." It was discovered "that there were bilateral tenth rib fractures, which were subacute, meaning they had already undergone some changes of healing which meant that they were old." "The skull examination was really pretty much unrevealing[; however, there] was some widening detected of the anterior suture line, [the front of the skull where the bones are closely united,] which made it difficult to rule out a skull fracture."

After K. E. B. became "stable," she was "air lifted . . . to the Scottish Rite Children's Hospital [in Atlanta, Georgia]." It was there discovered that the child's threatening condition was a result of "bilateral subdural hematomas," which "caused . . . increasing pressure . . . in the brain and swelling of the brain tissue." K. E. B. "had two [surgical] procedures . . . to draw fluid from the brain . . .", and, after more than a month in the hospital, K. E. B. was released to the custody of the Habersham County Department of Family and Children Services and is currently retained in foster care.

Neither parent could reasonably explain the cause of K. E. B.'s injuries. However, the mother later pleaded guilty to one count of cruelty to children in that she "maliciously" caused K. E. B. to suffer injuries.[2] (A psychological evaluation of the mother reveals that she

---

[2] The mother was sentenced as a first offender to serve 10 years on probation with the following special conditions of probation: "1. Seek mental health evaluation and treatment as may be directed by Probation Officer. 2. Do not seek custody, or interfere with the Depart-

has severe limits on her aggressive impulses when overwhelmed by stress.) The father was not convicted for any crime relating to K. E. B.'s injuries. In fact, it appears that he was at work at the time K. E. B. sustained head injuries. (A psychological evaluation of the father indicates that he is "shy, retiring and timid" and may be unable to protect K. E. B. in the wake of his wife's violent response to child-rearing stress.)

After the Department of Family and Children Services assumed custody of K. E. B., the parents were informed by "a Case Worker Principal" that they could visit with K. E. B. once a month at the "Family and Children's Services Office." More specifically, the "Case Worker Principal" "talked with [K. E. B.'s parents] about the goal of . . . going to parenting classes as well as counseling for both of them and regular visitation. . . ." She later arranged for K. E. B.'s parents to pay the Department of Family and Children Services $10 per month for child support. However, it was not until December 29, 1986, that the Juvenile Court of Habersham County entered an order placing K. E. B. in the temporary custody of the Department of Family and Children Services, "effective August 18, 1986." The temporary custody order provided "that the parents shall submit to family counseling and such other reasonable requests and services as are provided by the Habersham County Department of Family and Children Services." The parents were also required to "undergo a psychological examination and [to] submit to such reasonable continued psychological treatment as the initial examination shows to be warranted." The order further provided that "[v]isitation shall be specifically limited to such times and places as the Habersham County Department of Family and Children Services deems appropriate between the parents and said child [and that] periodic administrative review of this matter will be held and that each of the parents will be provided with specific goals that must be obtained before the child above named can be returned to their care and custody."

Both parents have regularly visited with K. E. B. and have displayed a great deal of concern regarding loss of their parental rights. However, they have been somewhat less than diligent in fulfilling the other "goals" suggested by the Department of Family and Children Services' "Case Worker Principal." In this regard, neither the mother nor father have pursued mental health counseling, the parents have attended only two parenting classes and they have made only one child support payment.

After conducting three hearings, the juvenile court entered an or-

ment of Family and Children Services in regard to custody of any child. 3. Attend school, or vocational training insofar as possible. 4. Maintain employment insofar as possible."

der and concluded "that there is a high degree of likelihood that [the mother], when presented with a stressful situation, would commit cruelty toward her daughter, [K. E. B.], and that because of his physical disability, and because of his inability to influence or affect [the mother's] behavior, [the father] could not protect his daughter against such behavior." The Court further found "that both parents have failed to comply with the Court-ordered plan designated to reunite the child with her parents [and ordered] that the parental rights of [the parents] are hereby terminated as to their daughter, [K. E. B.], and that the child [be] committed to the custody of the Department of Human Resources. . . ." *Held*:

A termination of parental rights because of parental misconduct or inability is a remedy of last resort which can only be sustained after "clear and convincing" evidence that "[t]he child is a deprived child, as such term is defined in Code Section 15-11-2; [that] lack of proper parental care or control by the parent in question is the cause of the child's status as deprived; [that such] cause of deprivation *is likely to continue or will not likely be remedied*; and [that the] continued deprivation will cause or is likely to cause serious physical, mental, emotional or moral harm to the child." (Emphasis supplied.) OCGA § 15-11-81 (b) (4) (A) (i)-(iv). See *Blackburn v. Blackburn*, 249 Ga. 689, 691 (292 SE2d 821).

In the case sub judice, Robert L. Frady, "a psychologist, licensed by the Georgia State Board of Examiners," examined K. E. B.'s mother and father and concluded that both parents lack certain parenting skills necessary to provide K. E. B. a safe home environment and that it would be in the best interest of the child to "remain in foster placement" until the parents can be treated for their deficiencies. More specifically, Dr. Frady affirmed that the mother "has severe limits to her ability to curb her aggressive impulses when overwhelmed by stress": and testified that she "could benefit from effective parenting training and training geared toward reduction of her behavioral outbursts, anger management training, control of impulsive response and intervention directed at controlling her anger that is partly related to her history of being abused. . . ." With regard to the father, Dr. Frady reported that "[h]e may have difficulty making even minor decisions and may become overwhelmed by major ones," and testified that the father "could benefit from effective parenting training and assertiveness training dealing with his wife's aggressive outbursts." This testimony, along with other "clear and convincing" evidence that K. E. B. was severely abused by her mother, is sufficient to sustain the juvenile court's finding that the parents are *presently* unfit to care for K. E. B. See *Jones v. Dept. of Human Resources*, 168 Ga. App. 915, 916 (1) (310 SE2d 753). However, we cannot ignore Dr. Frady's unchallenged testimony that he "didn't

have any data . . . indicating number one, [that K. E. B.'s parents] couldn't change, and number two, that they had had access to the type of [behavioral training and psychological] intervention that they needed." Nor can we ignore Dr. Frady's "prognosis" that with appropriate treatment the father's "ability for developing effective parenting skills appears to be quite good" and his opinion that the mother's "prognosis" is "guarded." This testimony brings into question the sufficiency of the evidence regarding the likelihood of parental habilitation as is contemplated by OCGA § 15-11-81 (b) (4) (A) (iii). From this perspective, we examine the evidence relating to the trial court's finding that "both parents have failed to comply with the Court ordered plan designed to reunite the child with her parents."

Although it is undisputed that the parents failed to attend psychological counseling and were sporadic in attending parenting classes, Dr. Frady testified that the mother and father's apparent lack of motivation in following these guidelines was due to their "[u]nsophistication, immaturity [and] lack of trust of State agencies." Dr. Frady explained that the parents did not seem to fully understand the "plan" provided by the Department of Family and Children Services' "Case Worker Principal," that they did not know the "types of treatment they need, where they need to go" and that the parents felt that their relationship with the Department of Family and Children Services was "adversarial." In fact, Dr. Frady indicated that there was no "clear" and effective plan designed to reunite the family and suggested that the parents be provided with a habilitation plan specifically designed to "head them in the right direction, structure it, lay it out, and then if we don't have compliance, then well, we terminate [parental rights]."[3]

We affirm Dr. Frady's suggestion since there was less than "clear and convincing" evidence that the parental unfitness which caused K. E. B.'s deprivation "will not likely be remedied." OCGA § 15-11-81 (b) (4) (A) (iii). Compare *In the Interest of P. F. J.*, 174 Ga. App. 47 (2) (329 SE2d 194) and *In the Interest of C. M. S.*, 185 Ga. App. 549, 550 (2) (364 SE2d 908). We also find no competent evidence showing that the father's physical disability will likely impair his ability to care for K. E. B. In this regard, there was no evidence that a physical evaluation of the father had been performed, no competent testimony outlining the various forms and consequences of "muscular dystrophy" and no expert testimony identifying the father's physical limitations or whether his physical condition will deteriorate.

" 'There is no judicial determination which has more drastic sig-

---

[3] Dr. Frady recommended specialized clinical intervention, involving "one on one individual training with [both parents] as well as observation with them interacting with [K. E. B.]."

nificance than that of permanently severing a natural parent-child relationship. It must be scrutinized deliberately and exercised most cautiously.' *McCormick v. DHR*, 161 Ga. App. 163, 164 (288 SE2d 120) (1982)." *Jones v. Dept. of Human Resources*, 168 Ga. App. 915, 916 (1), supra. In view of the circumstances of the case sub judice, the trial court's order terminating the parents' parental rights is vacated and the case is remanded for consideration of alternative dispositions as expressly authorized by OCGA § 15-11-81 (c). See OCGA § 15-11-34. See also *Jones v. Dept. of Human Resources*, 168 Ga. App. 915 (1), 917, supra.

*Judgment vacated and case remanded with direction. Pope and Benham, JJ., concur.*

DECIDED JANUARY 31, 1989.

*Winslow H. Verdery, Jr.*, for appellant.

*Michael J. Bowers, Attorney General, Marion O. Gordon, First Assistant Attorney General, Carol A. Cosgrove, Senior Assistant Attorney General, Ernest H. Woods III*, for appellee.