A99A1396, A99A1397. IN THE INTEREST OF J. V., a child (two cases).
(526 SE2d 386)

ANDREWS, Presiding Judge.

These are related appeals by the natural parents of J. V., a minor child, from separate orders of the Cobb County Juvenile Court determining that J. V. is deprived and terminating the rights of his natural parents. In Case No. A99A1396, appellants assert that there was insufficient evidence to support the juvenile court's deprivation order. In Case No. A99A1397, appellants challenge the termination order, asserting numerous errors. For reasons that follow, we affirm both the deprivation order and the termination order.

*Facts*

J. V., born on July 7, 1997, is the only child of appellants, who are married. J. V. lived with his parents in an apartment near the home of his maternal grandmother, who cared for him during the day while his parents worked.

On Wednesday afternoon, November 12, 1997, J. V.'s mother took him to the Cobb County Health Department for a routine well-baby checkup. During the examination, a nurse noticed bruises and a red mark on J. V.'s lower back and two fading marks on his arm. The nurse also said the baby did not seem happy, and she was bothered by this. She could not get the baby to smile or respond to her. The nurse was concerned enough to call several other nurses in and then to call the Department of Family & Children Services ("DFCS") and report suspected abuse. J. V.'s mother was unable to give any satisfactory explanation of how the marks occurred.[1]

On Friday evening, November 14, Rachel Oliver, an investigator with DFCS, visited J. V.'s residence to follow up on the nurse's report. Oliver spent approximately 30 minutes at the apartment, during which she held J. V. and examined him. The bruises had faded, and Oliver saw no swelling and no sign that J. V. was in any pain. According to Oliver, J. V.'s mother was very cooperative and behaved appropriately and lovingly toward J. V. Oliver thought that the baby seemed happy and that the apartment was very neat and clean. She felt comfortable leaving J. V. with his parents.

At around 2:15 p.m. on Saturday, November 15, J. V.'s mother took him to Egleston Hospital because he was eating little and she suspected he had a throat infection. For the remainder of that day and night, J. V. remained with his parents, who reportedly noticed nothing unusual about him except his cold symptoms. On Sunday,

---

[1] The nurse called in a Spanish-speaking nurse to translate, so there was no problem with the language barrier.

November 16, J. V. was home with his parents all day, except for a three-hour visit to the home of J. V.'s grandmother for dinner. Appellants testified that they noticed nothing unusual about J. V. on Sunday.

On Monday morning, November 17, the family again stayed home — with the exception of a brief shopping trip — because J. V. was still ill and his father also had a cold. J. V.'s mother went to work at 1:00 p.m., leaving the baby with the father. At approximately 4:00 p.m., J. V.'s father took him to his grandmother's house and then left to get his wife from work. Appellants returned to J. V.'s grandmother's house around 6:30 p.m., ate dinner, and then took J. V. home to their apartment, where they remained for the rest of the evening. Around midnight, when J. V.'s mother awoke to feed him and give him medicine for his cold, she noticed that he would not roll over onto his left side and seemed a little uncomfortable. At about 3:00 a.m., J. V.'s father noticed that he was "restless" and gave him some Tylenol.

Tuesday morning, November 18, J. V.'s father noticed that J. V.'s left arm was swollen and bruised. He reported this observation to his wife, applied a salve to J. V.'s arm, and left for work. J. V.'s mother took J. V. to his grandmother's and then went to work. At approximately 10:00 a.m., J. V.'s mother called to check on him and was told that everything was fine. Around noon, J. V.'s father called the grandmother's house to report the swelling. Two hours later, the grandmother called the mother and said that the swelling had worsened and J. V. needed medical attention. J. V.'s mother left work, picked up J. V., and took him to Egleston Hospital. There, X-rays revealed that J. V. had at least thirteen fractures involving all four extremities.

DFCS obtained emergency custody of J. V. and placed him in the home of a family friend. In December 1997, the juvenile court held a hearing to determine whether J. V. was deprived. At the hearing, J. V.'s mother, father, and grandmother all denied hurting him and denied any knowledge of how the fractures occurred. Appellants testified that, while they knew J. V. was uncomfortable at various times from Friday, November 14 to Tuesday, November 18, they attributed the discomfort to his cold and to shots he had received at his checkup on November 12.

The State presented testimony from Dr. Michael Busch, a pediatric orthopedic surgeon who examined J. V. on November 20 and studied his X-rays. According to Dr. Busch, J. V.'s left elbow was fractured, both bones in his left forearm were completely broken, and his right forearm had an incomplete fracture. J. V.'s right fibula, femur, and shin bone were fractured. His left leg was fractured through the upper shin bone and the fibula. Dr. Busch testified that these fractures all occurred at or around the same time, within seven to ten

days before the X-rays were taken. In addition, Dr. Busch testified that the X-rays showed a possible slightly older, healing fracture in J. V.'s left upper arm. The orthopedic surgeon noted that children's bones are much more flexible than adult bones, so it is common to find incomplete fracture patterns but more uncommon to find complete breaks. Nevertheless, J. V. had a complete fracture of the ulna in which the bone was broken in two and had shifted about a quarter of an inch. Likewise, there was a complete fracture of the radius, a complete fracture of the fibula, and a complete fracture of the tibia and fibula in the other leg. The doctor said the fractures were the result of trauma, and he could find no explanation for them other than child abuse. The doctor also rejected the possibility, raised by appellants, that J. V.'s fractures resulted from osteogenesis imperfecta, or brittle bone disease. He said the baby showed no signs of osteogenesis imperfecta and stated that for a baby to have this many fractures due to osteogenesis imperfecta, the disease would be severe and therefore apparent, and he found no signs of the disease in the X-rays. In addition, he said he had never seen or heard of two of the fractures in association with osteogenesis imperfecta. Also, a collagen study was done for signs of the disease, and the results were normal. Most importantly, the baby has continued to develop normally and has had no problems with fractures since he was taken away from his parents.

As to the cause of J. V.'s fractures, Dr. Busch saw "no other plausible explanation for them" except child abuse. He testified that some of the fractures were probably "bending injuries" caused by the application of side-to-side force, while others were consistent with a direct blow or strike. Dr. Busch thought it "extremely unlikely" that the injuries were accidental because several of J. V.'s fractures "almost never occur as a result of accidental trauma." Radiologist Dr. Elwin Donnelly, who testified for appellants, agreed with Dr. Busch regarding the number and type of fractures. Dr. Donnelly testified, however, that the fractures did not all occur simultaneously but happened over the course of one to seventeen days before the X-rays. According to Dr. Donnelly, the fractures could be consistent either with child abuse or with accidental injury. Specifically, Dr. Donnelly testified that some of the injuries may have resulted from J. V.'s limbs striking his one-year-old cousin while he was swinging in his mechanical swing or from his wrists getting caught while the support arm of his crib was being lowered. Dr. Donnelly further testified that J. V. could not have caused the fractures himself. Although the fractures would have caused "immediate sudden pain" expressed through crying, Dr. Donnelly testified that J. V.'s caregivers may not have been aware of them because "a cry related to a fracture doesn't differentiate itself from a cry for any other reason."

At the close of the deprivation hearing, the juvenile court judge stated that she found by clear and convincing evidence that J. V. had been "physically abused by somebody while in the care and control of the parents." The judge rejected the theory that J. V.'s fractures resulted from his swing or crib, stating that such products are generally safe and that the caregivers should have been watching him. Based on appellants' complete denial of responsibility for J. V.'s fractures and their failure to provide any plan for protecting him from injury, the judge further found that J. V.'s deprivation was likely to continue in the future. Accordingly, the judge ordered that J. V. remain in the custody of DFCS.

On March 31, 1998, DFCS filed a petition to terminate the parental rights of J. V.'s parents. In October 1998, the juvenile court held a termination hearing at which many of the same witnesses testified. In addition, counsel stipulated that the record from the prior deprivation hearing would be included in the termination proceedings. Counsel also stipulated the entry into evidence of a report from Dr. Joseph Burton, a forensic pathologist who serves as chief medical examiner for metropolitan Atlanta and was an expert witness for both sides.

Dr. Burton examined J. V.'s medical records and X-rays and concluded that the fractures were seven to ten days old at the time of the X-rays, happened at or around the same time, and could not have occurred accidentally. Like Dr. Busch, Dr. Burton rejected the possibility that J. V. suffered from brittle bone disease. Dr. Burton testified that some of J. V.'s fractures were "[v]irtually diagnostic for 'physical abuse'" and probably resulted from jerking or twisting of the extremities. Dr. Burton noted, however, that J. V. appeared to be loved and well nourished, that he was provided with regular medical care, that there was no evidence of head or torso injuries typically associated with child abuse, and that there was no sign of very old, healing fractures. Thus, Dr. Burton concluded that the injuries probably resulted from one of J. V.'s adult caregivers improperly jerking his legs while changing his diaper or jerking his arms and legs because J. V. was crying or "fussy" and the caregiver was under stress. Dr. Burton also testified that the caregiver could have caused the fractures without intending to do so and without realizing what had happened. Nevertheless, Dr. Burton felt that it would be "unfair to this infant . . . for the system not to intervene to ensure that such injuries do not continue and do not happen again."

Dr. Busch testified at the termination hearing that J. V.'s fractures had healed, but his left leg was slightly deformed and could require correctional surgery. Dr. Busch also testified that J. V. had suffered no further fractures since November 1997.

Appellants testified at the hearing and again denied any knowl-

edge of how J. V.'s fractures occurred. They further denied jerking or twisting J. V.'s arms or legs or handling him in a rough manner.

Margaret Bakalini, the DFCS caseworker assigned to J. V., testified that DFCS was seeking termination of parental rights because there had been no acceptable explanation for J. V.'s very serious injuries and the only way to ensure J. V.'s safety was to place him in an adoptive home.

The record shows that DFCS developed a case plan dated December 18, 1997, to reunify J. V. with his parents. That plan required appellants to take a parenting class, to keep in contact with the DFCS case manager, and to pay child support. The parents complied with this plan; however, as the DFCS caseworker testified, there was no way to develop a reunification plan which addressed the problem that caused the baby's injuries because the parents never explained how the injuries could have occurred.

Appellants' expert, a licensed clinical psychologist, evaluated appellants and testified that based on what the mother told her and how the mother presented herself, she concluded that the mother "did not have anything to do with the injuries." But, when counsel asked her if she would change her assessment if informed that the injuries to J. V. could not have happened absent abuse and that the abuse would have come from either or both parents, she replied that her assessment would change.

Finally, the mother testified that if J. V. were returned to their custody, she would stay home with him full time, would handle him even more gently than she had in the past, would cooperate fully with DFCS, and would find a doctor who speaks her language and could communicate with her about J. V.'s health and safety.

After the hearing, the juvenile court entered an order terminating the parental rights of appellants. The court found that J. V. suffered extreme physical abuse while in the care of his mother, father, or maternal grandmother, all of whom denied inflicting the injuries and failed to provide valid explanations for them. The court further found that appellants refused to acknowledge that J. V. needed protection from future injury and failed to provide a plan for such protection and that, if he were returned to them, he would go back into the very same environment in which he was injured. Accordingly, the court found that it was in J. V.'s best interest that the rights of his parents be terminated.

## Case No. A99A1396

Pursuant to OCGA § 15-11-2 (8) (A), a "[d]eprived child" is one who "[i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his

physical, mental, or emotional health or morals." We have held that

> [a] parent may lose custody where the court determines by clear and convincing evidence that the child is deprived and will likely be harmed by such deprivation. OCGA §§ 15-11-33 (b) (1); 15-11-34 (a) (2). Deprivation may be shown to have resulted from parental unfitness that is either intentional or unintentional misconduct resulting in the abuse or neglect of a child by what is tantamount to physical or mental incapability to care for the child.

*In the Interest of C. N.*, 231 Ga. App. 639, 640 (1) (500 SE2d 400) (1998).

On appeal, we view the evidence in the light most favorable to the juvenile court's judgment to determine whether any rational trier of fact could have found clear and convincing evidence of deprivation. *In the Interest of S. S.*, 232 Ga. App. 287, 289 (501 SE2d 618) (1998). We do not weigh the evidence or determine the credibility of witnesses. Id.

Applying this standard, we find that the juvenile court's deprivation order was supported by clear and convincing evidence. J. V. had unexplained bruises on his arms and back on November 12. Six days later, X-rays revealed at least thirteen fractures in his arms and legs that, according to Dr. Busch, could be explained only as child abuse. Although there was no evidence concerning precisely how J. V.'s bones were broken or exactly who was responsible, clear and convincing evidence showed that J. V. was in the exclusive care of his parents and maternal grandmother from Friday, November 14 to Tuesday, November 18 — the period in which the fractures must have occurred.[2] Finally, appellants could not explain the fractures and provided no evidence at the deprivation hearing that they would do anything differently should J. V. be returned to their custody. Based on this evidence, the juvenile court was authorized to conclude that J. V. was deprived in that he was intentionally harmed while in appellants' care. See *Rodgers v. Dept. of Human Resources*, 157 Ga. App. 235, 236 (2) (276 SE2d 902) (1981) (affirming juvenile court's finding of deprivation where baby had multiple fractures, even though "the mystery of causation was never satisfactorily unraveled"); *In the Interest of G. T. T.*, 199 Ga. App. 706 (405 SE2d 750)

---

[2] Expert testimony established that the fractures occurred within seven to ten days preceding the X-rays. As DFCS caseworker Rachel Oliver testified that J. V. did not appear to be in pain when she held him on Friday, November 14 and no broken bones were discovered during J. V.'s visit to the hospital on Saturday, November 15, it is logical to assume that the fractures occurred sometime over the weekend or on Monday, November 17.

(1991) (juvenile court found deprivation where two-month-old was brought to hospital with multiple fractures).

Appellants argue that the juvenile court's order contains only conclusory statements, without reference to specific pieces of evidence, so that they cannot ascertain what the court relied upon in reaching its conclusion. We disagree. "Finding[s] of fact and conclusions of law are mandatory under OCGA § 9-11-52 (a)." (Punctuation omitted.) *In the Interest of D. L. G.*, 212 Ga. App. 353 (1) (442 SE2d 11) (1994). The juvenile court's order sets forth the facts on which its conclusions are based — the 13 fractures of J. V.'s extremities — and thus complies with the requirements of OCGA § 9-11-52.

Appellants also challenge the juvenile court's finding that they failed to establish a "safety plan," arguing that the term "safety plan" is vague and not supported by any statutory requirement. As the juvenile judge explained in detail at the hearing, however, her concern was that appellants had given no indication that they would take any steps to protect J. V. from future injury should he be returned to their custody. Under these circumstances, the reference in the deprivation order to a "safety plan" was not impermissibly vague.

## Case No. A99A1397

In this case, the parents appeal from the juvenile court's order terminating their parental rights. They claim the juvenile court erred in concluding there was clear and convincing evidence of present unfitness. We disagree and affirm.

In order to terminate parental rights, a juvenile court must determine (1) that there is present clear and convincing evidence of parental misconduct or inability; and (2) that termination of parental rights is in the best interest of the child, considering the physical, mental, emotional, and moral condition and needs of the child. OCGA § 15-11-81 (a). A determination of parental misconduct or inability requires findings that (1) the child is deprived; (2) the deprivation is caused by lack of proper parental care or control; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation will likely cause serious physical, mental, emotional, or moral harm to the child. OCGA § 15-11-81 (b) (4) (A). Among the factors relevant to determining whether the child is without proper parental care and control are whether the parent has engaged in egregious cruel or abusive conduct toward the child and whether the parent has physically, mentally, or emotionally neglected the child. OCGA § 15-11-81 (b) (4) (B) (iv), (v). On appeal, we determine whether any rational trier of fact could have found by clear and convincing evidence that appellants' rights to custody have been lost. *In the Interest of A. C.*,

230 Ga. App. 395, 396 (1) (496 SE2d 752) (1998).

1. In their first assertion of error, appellants contend that there was no clear and convincing evidence of their *present* misconduct or inability. We disagree.

As discussed above, the evidence supported the juvenile court's findings that J. V. was deprived. The evidence also supported the finding that the deprivation resulted from appellants' lack of proper parental care or control. In addition to the expert testimony, the juvenile court at the termination hearing also had the benefit of Dr. Burton's report, which stated in part that it was "blatantly obvious" that J. V. "has not been properly cared for" and that his injuries probably resulted from "inappropriate handling" by a single adult caregiver. This report, along with Dr. Busch's testimony and appellants' admission that J. V. was in their care when the injuries most likely occurred, constitutes clear and convincing evidence that J. V.'s injuries resulted from lack of proper parental care or control.

There was also clear and convincing evidence that J. V.'s deprivation would likely continue if he were returned to appellants' custody. The past conduct of the parents is properly considered by the court in determining whether the cause of the deprivation is likely to continue. *In the Interest of C. D. A.*, 238 Ga. App. 400, 404 (3) (519 SE2d 31) (1999). Although " 'evidence of past unfitness, standing alone, is insufficient to terminate the rights of a parent in [his or] her natural child,' " *In the Interest of K. J.*, 226 Ga. App. 303, 304 (1) (486 SE2d 899) (1997), in this case we have past unfitness in the form of parents who were twice reported to DFCS by the time their baby was four months old and a baby with extensive and severe injuries which have left him deformed and which have never been explained. The only explanation, after ruling out some form of brittle bone disease, lies with the parents themselves. They have never identified the source of the problem; therefore, the abuse is unremedied, and the home situation remains the same as when the baby suffered the broken bones.

Therefore, there was clear and convincing evidence of parental misconduct, i.e., (1) the child is deprived; (2) lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue or will not likely be remedied; and (4) the continued deprivation will likely cause serious harm to the child. OCGA § 15-11-81 (b) (4) (A).

Finally, after the juvenile court found parental misconduct under OCGA § 15-11-81 (b), the court then had to determine whether termination was in the child's best interest, considering the physical, mental, emotional, and moral condition of the child, including the need for a secure and stable home. OCGA § 15-11-81 (a); *In the Interest of E. C.*, 225 Ga. App. 12, 18 (482 SE2d 522) (1997). In making

this determination, the court could consider the detrimental effects of prolonged foster care on the child. *In the Interest of M. L.*, 227 Ga. App. 114, 117 (488 SE2d 702) (1997).

In this case, the child has been in foster homes longer than he has lived with his parents. After almost a year, the parents still had not identified the problem and there was no indication that the situation would change at any time in the near future. There was also the testimony of the baby's treating pediatric orthopedist that children who have been injured in this manner and are then returned to the family "have a significant instance of ending up reinjured and occasionally dead."

Therefore, looking at the record in the light most favorable to upholding the juvenile court's determination, we hold there was clear and convincing evidence from which the juvenile court could properly conclude that it was in the child's best interest that parental rights be terminated.

2. In light of the holding above, we do not address the remaining assertions of error.

*Judgments affirmed. Johnson, C. J., McMurray, P. J., Pope, P. J., Smith and Eldridge, JJ., concur. Ruffin, J., concurs in Case No. A99A1396 and dissents in Case No. A99A1397.*

RUFFIN, Judge, concurring in part and dissenting in part.

This is a difficult case. It illustrates perfectly the interests that must be balanced in cases involving the termination of parental rights. On the one hand, Georgia law zealously guards the rights of parents to retain custody and control of their children; on the other hand, the law protects the safety and health of children.[3] As a remedy of last resort, the courts will terminate parental rights if the State proves parental misconduct or inability by clear and convincing evidence.[4] Balancing these competing concerns in this case, I conclude that the State failed to carry its burden and that the juvenile court should not have terminated appellants' parental rights. Thus, while I concur with the majority's opinion in Case No. A99A1396, affirming the juvenile court's order holding that J. V. is a deprived child, I respectfully dissent from the majority's opinion in Case No. A99A1397, affirming the juvenile court's order terminating appellants' parental rights.

As the majority notes, to prove parental misconduct or inability justifying the termination of appellants' parental rights, the State must present clear and convincing evidence that: (1) J. V. was deprived; (2) his deprivation was caused by a lack of proper parental

---

[3] *In re Suggs*, 249 Ga. 365, 367 (2) (291 SE2d 233) (1982).
[4] *In the Interest of K. E. B.*, 190 Ga. App. 121, 124 (378 SE2d 171) (1989).

care or control; (3) the cause of J. V.'s deprivation is likely to continue; and (4) continued deprivation will likely cause serious harm to J. V.[5] I agree with the majority that the State carried its burden with respect to the first two factors. I cannot agree, however, that the State presented clear and convincing evidence that J. V.'s deprivation would likely continue if he were returned to appellants' custody.

The majority concludes that the deprivation would likely continue based on appellants' past conduct. Although the juvenile court was authorized to consider that conduct in evaluating the likelihood of future deprivation, "evidence of past unfitness, standing alone, is insufficient to terminate the rights of a parent in [his or] her natural child; clear and convincing evidence of *present* unfitness is required."[6] There is *no* evidence of present unfitness in this case.

Appellants complied in every respect with the case plan established by the Department of Family & Children Services and adopted by the juvenile court to reunite them with their son. That plan required appellants to take a parenting class, to keep in contact with the DFCS case manager, and to pay child support. The majority fails to recognize that appellants did all of this and more. They took parenting classes, as well as an additional cardiopulmonary resuscitation class; they paid monthly child support for J. V.; and there is no evidence that they failed to communicate with DFCS. They also visited J. V. three to four times per week, provided his formula and diapers, and washed his clothes. J. V.'s physical custodian testified that appellants followed all of DFCS' rules during the visits, treated J. V. carefully and protectively, and did "everything to show me that they are good parents." J. V.'s mother testified that if J. V. were returned to the custody of his parents, she would stay home with him, treat him carefully, cooperate with DFCS, and ensure that J. V. received effective medical care. Finally, appellants submitted to polygraph tests, which they passed, and were evaluated by a clinical psychologist, who testified that they did not seem capable of violence.[7] Thus, the unrefuted evidence showed that appellants complied fully with the reunification case plan and that they are conscientious and willing to take any step required in order to be reunited with their child. Under these circumstances, Georgia law does not allow us to terminate their parental rights at this time.[8]

---

[5] See OCGA § 15-11-81 (b) (4) (A).

[6] (Punctuation omitted; emphasis in original.) *In the Interest of K. J.*, 226 Ga. App. 303, 304 (1) (486 SE2d 899) (1997).

[7] There is no evidence that the maternal grandmother, who also had access to the child, submitted to such testing.

[8] See *In the Interest of J. E. E.*, 235 Ga. App. 247, 249-250 (509 SE2d 147) (1998) (no termination of parental rights where evidence showed natural mother complied with goals of case plan); *In the Interest of K. E. B.*, supra at 124-125.

The majority concludes that J. V.'s deprivation would likely continue because of appellants' failure or inability to come forward with an explanation for his injuries. The case plan developed by DFCS, however, contained no such requirement, and there is no evidence in the record that anyone from DFCS ever demanded such an explanation from appellants as a precondition to the return of their child.[9] We must remember that the burden of proof in a termination case lies with the State, not the parents.[10] Having elected to remove J. V. from his parents' custody and to develop a reunification case plan, DFCS was responsible for clearly stating the requirements of that plan:

> The [case] plan . . . shall contain . . . *[a] clear description of the specific actions to be taken by the parents* and the specific services to be provided by [DFCS] or other appropriate agencies in order to bring about the identified changes that must be made in order for the child to be safely returned home.[11]

Appellants were not required to read additional provisions into the case plan based upon speculation about what DFCS might really have wanted. In fact, appellants were in a particularly poor position to do so because, as DFCS knew, they are native Spanish speakers with a minimal command of the English language. Although appellants did not offer a conclusive explanation for J. V.'s injuries, that was not a requirement of the plan, and the evidence showed without dispute that appellants took all actions that *were* specifically required by the plan.

The majority apparently dismisses appellants' compliance with the case plan because the plan failed to address the cause of J. V.'s injuries. The majority points out that the DFCS caseworker testified that she could not develop a meaningful plan because appellants provided no explanation for the injuries. But DFCS determined that reunification may be appropriate, and DFCS was therefore required to formulate a plan addressing "each reason requiring removal" of J. V. from appellants' custody and prescribing "specific actions . . . in order to bring about the identified changes that must be made in order for the child to be safely returned home."[12] The case plan could have — and probably should have — explicitly required that appellants satisfactorily explain the reasons for their son's injuries. Alternatively, DFCS could have determined at the outset that reunifica-

---

[9] In fact, the evidence showed that, with the exception of Rachel Oliver's half-hour visit on November 14, no one from DFCS ever visited appellants for any reason.

[10] See *In the Interest of H. L. T.*, 164 Ga. App. 517, 520 (298 SE2d 33) (1982).

[11] (Emphasis supplied.) OCGA § 15-11-41 (d) (3).

[12] Id.

tion was not appropriate, or it could have proceeded as though all three caregivers were child abusers and required appropriate rehabilitative or protective measures.[13] But DFCS took none of these steps. Instead, it chose to develop a case plan that skirted the very issue which it now blames appellants for failing to address and on which it bases its petition to terminate their parental rights: what exactly happened to J. V.? It is unfair and contrary to the law to penalize appellants for the shortcomings in the case plan developed and administered by DFCS. The whole point of a reunification plan is that the parents are entitled to regain custody of their child if they meet its requirements. Because appellants complied fully with every stated provision of the plan, I believe their parental rights should not be permanently severed at this juncture.

Like the majority, I am troubled by the number and extent of J. V.'s fractures and the absence of any conclusive explanation for them. By dissenting in this case, I do not intend in any way to minimize the horror of what happened to J. V. But I also cannot disregard the parents' actions since the injuries occurred. As my colleagues will likely agree, we seldom see a parental rights termination case in which the parents have not only complied with every provision of the case plan, but have gone beyond the requirements of the plan to ensure the welfare of their child.

I am reminded of the adage that "bad facts make bad law." The facts with regard to J. V.'s injuries are undeniably bad. But it remains the burden of the State to prove *present* parental unfitness by clear and convincing evidence. This the State failed to do. The evidence in the record simply does not allow an inference of *present* parental unfitness in light of appellants' full compliance with the case plan and other actions since J. V. was removed from their custody. Accordingly, I dissent.

DECIDED DECEMBER 1, 1999 —
RECONSIDERATION DENIED DECEMBER 20, 1999 — 

*Rebecca A. Hulsey, Wayne D. Keaton,* for appellants.
*Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen A. Sgrosso, Assistant Attorney General, Edwards, Friedewald & Grayson, Robert J. Grayson,* for appellee.

---

[13] See OCGA § 15-11-41 (b) (4), (d).