A97A0305, A97A0306. In the Interest of K. J., a child (two cases).
(486 SE2d 899)

Blackburn, Judge.

In these two cases, the parents of K. J. appeal the juvenile court's termination of their parental rights.

"OCGA § 15-11-81 (a) provides a two-step procedure to be followed in considering the termination of parental rights. First, the court shall determine whether there is present clear and convincing evidence of parental misconduct or inability as provided by OCGA § 15-11-81 (b). Secondly, if there is clear and convincing evidence of such parental misconduct or inability, the court shall then consider whether termination of parental rights is in the best interest of the child." (Punctuation omitted.) *In the Interest of A. T.*, 187 Ga. App. 299, 301 (2) (370 SE2d 48) (1988). "It is not proper to consider the question of termination of parental rights based solely upon a 'welfare of the child' test, without some required showing of parental unfitness." (Punctuation omitted.) Id. at 300.

In order to find "parental misconduct or inability," the court must find (1) that the child is a "deprived child," as defined in OCGA § 15-11-2; (2) that the lack of proper parental care or control by the parent in question is the cause of the child's status as deprived; (3) that such cause of deprivation is likely to continue or will not likely be remedied; and (4) that the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child. OCGA § 15-11-81 (b) (4) (A).

### Case No. A97A0306

1. In her only enumeration, the mother contends the trial court erred in finding that the cause of the deprivation suffered by K. J. was likely to continue or would not be remedied, which finding is a prerequisite to termination of parental rights. See OCGA § 15-11-81 (b) (4) (A) (iii). "[T]he appropriate standard of review of the trial court's ruling is whether a rational trier of fact could have found by clear and convincing evidence that the natural parent's rights had been lost." *In re N. F. R.*, 179 Ga. App. 346, 348 (2) (346 SE2d 121) (1986).

K. J. was born in November 1990. At the time, his parents were not married and his father was incarcerated. Except for a five-month period between September 1992 and February 1993, the father has remained in prison the child's entire life. On December 21, 1990, K. J.'s mother was arrested on forgery charges, and K. J. was placed in the temporary custody of the Department of Human Resources (DHR). The mother was released on bond the next day, but the child remained in the custody of a foster parent, Ms. Burnette, with whom

he has remained ever since.

Approximately four months after her arrest, the mother was sentenced to four years in prison on the forgery charges. She remained in prison approximately ten months, and was then released on parole. About two years later, in May 1994, she was returned to prison for violating a condition of her parole by failing to attend a required substance abuse class. The mother was released from prison in March 1996.

On July 2, 1996, a hearing was held on termination of both parents' parental rights. At the conclusion of the hearing, the juvenile court terminated both parents' rights, finding that the child was deprived, that such deprivation was likely to continue, and that termination was in the best interest of the child.

In finding that K. J.'s deprivation was likely to continue and would not be remedied, the court primarily focused on the fact that, during the two years prior to the mother's second incarceration, she was not able to develop a stable situation in which to receive the child for a trial placement, and was not able to maintain her personal life in such a way as to prevent the parole board from revoking her parole. However, "evidence of past unfitness, standing alone, is insufficient to terminate the rights of a parent in [her] natural child; clear and convincing evidence of *present* unfitness is required." *Blackburn v. Blackburn*, 249 Ga. 689, 692 (292 SE2d 821) (1982).

The evidence showed, and the court found, that the mother had made significant progress toward completion of the DHR's reunification case plan during and following her second incarceration. She completed drug abuse and parenting classes in prison, as well as a course in sewing machine operation. While in prison, the mother arranged for her fiance to visit K. J. at his foster home and to bring him to the prison for visits. The mother also wrote several letters to the court expressing her conviction that, although she had made many mistakes in her life, she had changed and was ready and able to be a fit parent for K. J.

Following her release from prison in March 1996, the mother took steps to visit and establish a relationship with K. J. The record reflects that the mother visited K. J. approximately every week, as well as calling him on the telephone. After a period of shorter visits, the mother was able to keep K. J. all day on weekends, athough he did not stay overnight. The mother testified that K. J. seemed excited to go with her and did not act like he wanted to leave. The child's foster parent, Ms. Burnette, testified that K. J. went willingly with his mother, although he complained during the first few visits. Ms. Burnette also testified that K. J. wanted to stay with her but be able to visit his mother. There is no evidence in the record that the mother's relationship to the child was harmful to the child.

The DHR reunification case plan called for the mother to have a steady, legal income within six months of her release from prison. Shortly after her release, she used the sewing skills obtained in prison to obtain a job at a clothes manufacturing plant. However, because of a previous ankle injury which resulted in a plate and screws being placed in her ankle, she was forced to leave this job after a few days because she was unable to stand for long periods of time. She testified that she was scheduled to have ankle surgery on July 10, 1996, eight days after the termination hearing, and that, after recovery, she anticipated being able to obtain a job at another sewing plant with which she had interviewed. The mother also completed a program in job-seeking skills after release from prison.

The case plan also required the mother to obtain a safe, permanent home within six months of her release. The mother testified that she lived with her fiance in a rented house, and that they had lived there about four or five years. The Department of Family & Children Services (DFACS) caseworker testified that the interior of the house was clean and picked up. but that there was trash in the yard. She said she had spoken to the mother about this problem on June 15, and that the mother had agreed to clean up the yard, although it had not been fully cleaned by the time of the termination hearing on July 2. The mother testified that she and her fiance planned to marry, although they had not set a date.

Under these circumstances, the court erred in relying on the mother's situation prior to her second incarceration as the basis for terminating her parental rights. See *In re N. F. R.*, supra at 348 (reversing termination of parental rights even though "mother's life has been marked by a recurring pattern of drug abuse, crime and incarceration").

The court also predicated its ruling upon its finding that the mother was not able to maintain an independent lifestyle and did not have prospects of doing so in the near future. It appears that this finding was based upon the fact that the mother was not employed at the time of the termination hearing and was dependent upon her fiance for support. However, we have held that the fact that a mother is unemployed, without prospects for future employment, and without any stable living arrangements is not sufficient to terminate parental rights. See *Chancey v. Dept. of Human Resources*, 156 Ga. App. 338, 340 (1) (274 SE2d 728) (1980).

Moreover, the court's finding regarding the mother's prospects for attaining an independent lifestyle was premature and not supported by clear and convincing evidence. The termination hearing was held less than four months after the mother was released from prison, although the reunification case plan relied upon by the court required the mother to obtain employment within *six* months of her

release. As discussed above, the mother did in fact obtain employment shortly after her release, using sewing skills developed in prison, and was unable to maintain such employment only because of a preexisting physical condition. Furthermore, the mother testified that she was scheduled to have ankle surgery *eight days* after the hearing to correct the problem, and believed she would be able to obtain another job with a manufacturer following her recovery. Under these circumstances, the court's finding was premature and not supported by clear and convincing evidence.

Although we are reluctant to reverse a trial court's determination, "[t]here is no judicial determination which has more drastic significance than that of permanently severing a natural parent-child relationship. It must be scrutinized deliberately and exercised most cautiously. . . . Accordingly, compelling facts are required to terminate parental rights." (Punctuation omitted.) *In the Interest of S. M.*, 169 Ga. App. 364, 365 (1) (312 SE2d 829) (1983). In light of the above-described evidence, the court erred in finding that there was clear and convincing evidence that the cause of the child's deprivation with respect to the mother was likely to continue or would not be remedied. See *In re N. F. R.*, supra.

*Case No. A97A0305*

2. (a) With respect to the father, the evidence shows that, except for a five-month period between September 1992 and February 1993, he has been incarcerated for K. J.'s entire life. Although the reason for the five-month interval is not apparent from the record, it appears that the father has been incarcerated on the same forgery conviction for the child's entire life. The father testified that he was up for early release in either October 1996 or February 1997, and would be on parole for approximately four and one-half years following his release. He also testified that he had housing and a job lined up upon his release. The record does not reflect whether the father has in fact been released.

In addition to the current forgery conviction, the father has been convicted of four other felonies, including two forgery and two burglary convictions, the first such conviction occurring when he was sixteen years old. At the time of the hearing, the father was 47 years old and had spent 16 to 17 years in prison on the various convictions. He has not been out of jail for longer than four years since he was sixteen years old.

In determining whether a child is without proper parental care or control, the court may consider a parent's felony conviction and imprisonment which has a demonstrable negative effect on the quality of the parent-child relationship. OCGA § 15-11-81 (b) (4) (B) (iii);

see also *In the Interest of E. N. H.*, 216 Ga. App. 209 (453 SE2d 778) (1995). "[W]here, as in this case, an incarcerated parent has a criminal history of repetitive incarcerations for the commission of criminal offenses or parole violations, this constitutes an additional factor which may be considered in determining whether the child *presently* is without the proper parental care and control of the offending parent, and that such is likely to continue." (Punctuation omitted.) *In the Interest of L. F.*, 203 Ga. App. 522 (417 SE2d 344) (1992). Given the father's repeated felony convictions and incarcerations, and the fact that he has been unable to remain out of jail for any significant period of time his entire adult life, we cannot say that the court erred in finding that K. J. was a deprived child, that the lack of proper parental care or control by the father was the cause of such deprivation, and that the cause of K. J.'s deprivation with respect to the father was likely to continue. See OCGA § 15-11-81 (b) (4) (A) (i)-(iii).

(b) However, in order to terminate parental rights, the court must *also* find by clear and convincing evidence that "[t]he continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child." OCGA § 15-11-81 (b) (4) (A) (iv). The trial court did not include such a finding in its oral ruling following the hearing. In its subsequent written order, prepared by DFACS and issued more than a month after the hearing, the court included a summary statement that "[c]ontinued deprivation of the child is likely to cause serious physical, mental, emotional or moral harm to the child."

We have held that "[a]n order terminating parental rights must contain explicit findings supporting the conclusions that . . . by reason [of the deprivation] the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm." (Punctuation omitted.) *Griffith v. Ga. Dept. of Human Resources*, 159 Ga. App. 649 (284 SE2d 666) (1981). "[A] dry recitation that certain legal requirements have been met is insufficient to satisfy the requirements of the law. The trial judge is to ascertain the facts and to state not only the end result of that inquiry but the process by which it was reached." *Beasley v. Jones*, 149 Ga. App. 317, 319 (1) (254 SE2d 472) (1979) (reversing trial court where termination order did not specify facts supporting court's conclusion that child would likely suffer serious emotional harm); see also *In the Interest of G. K. J.*, 187 Ga. App. 443, 445 (3) (370 SE2d 490) (1988) ("juvenile court cannot make a bare recital as to a finding of the existence of parental misconduct or inability").

Although the order in this case recited that continued deprivation would likely cause serious physical, mental, emotional, or moral harm to the child, it did not set forth any facts which would support

this conclusion.[1] For this reason alone the termination order must be reversed. See *Beasley*, supra; *McCary v. Dept. of Human Resources*, 151 Ga. App. 181, 183 (2) (259 SE2d 181) (1979) (refusing to consider sufficiency of evidence where order did not set out sufficient findings and conclusions).

Moreover, there was no evidence presented at the hearing that the child was likely to suffer serious physical, mental, moral, or emotional harm absent a termination of parental rights. Indeed, there was evidence that the father and child had a positive relationship, to the extent permitted by the father's incarceration. During the five-month period when the father was out of jail, he visited K. J. regularly at his foster home. Before the father was transferred to a more distant prison, he would call K. J. on the telephone.[2] Although his reading and writing skills were minimal, the father would write to K. J. and send him cards on his birthday and holidays. K. J. knew that he was his father, and referred to him as "daddy" or "dad."

Neither the child's foster parent nor the DFACS caseworkers testified that the child was likely to suffer serious harm if parental rights were not terminated. None of the witnesses testified that the child's relationship with the father was harmful to the child. Indeed, K. J.'s foster parent testified that she did not believe it would hurt K. J. to have visits with his father. There was no expert testimony regarding the effect on the child of his father's incarceration or the likely effects if parental rights were not terminated. Cf. *In the Interest of A. W.*, 198 Ga. App. 391, 392-393 (401 SE2d 560) (1991) (expert testimony regarding negative effects of prolonged foster care); *Childers v. Clayton County Dept. of Family &c. Svcs.*, 147 Ga. App. 825, 826 (250 SE2d 564) (1978) (expert testimony regarding children's mental and emotional regression while in custody of parents). In announcing its ruling, the court noted that both parents were sincerely interested in K. J. and in trying to fashion a future relation-

---

[1] The order did set forth certain "examples of misconduct and/or inability of the parents to properly provide for their child." The court found that reunification had not occurred due to the parents' failure to meet their case plan goals; that the parents had not maintained regular contact with the child or the DHR, but had sporadically visited the child over the last five years; that the father was unable to provide a stable residence for the child due to his incarceration; and that the father was unavailable due to his incarceration. While such facts may support a finding of deprivation, they are not sufficient to enable the court to find by clear and convincing evidence that there is a likelihood of serious physical, mental, moral or emotional harm to the child. See *In the Interest of D. S.*, 212 Ga. App. 203, 204 (441 SE2d 412) (1994), overruled on other grounds, *In the Interest of J. P.*, 267 Ga. 492 (480 SE2d 8) (1997) ("bare statement of some facts considered does not show that those facts support the conclusions").

[2] The foster parent ultimately placed a block on her telephone line, preventing the father from calling. She testified that she did this not because of the father's calls, but because of her own children.

ship with him.

Accordingly, we cannot say that the evidence authorized the trial court to find by clear and convincing evidence that the child was likely to suffer serious physical, mental, moral or emotional harm. Therefore, the order terminating the father's parental rights must be reversed.

*Judgments reversed. Pope, P. J., and Johnson, J., concur.*

DECIDED APRIL 29, 1997.

Before Judge McDonald.

*Kristopher Shepherd*, for appellant (case no. A97A0305).

*Thomas J. Killeen*, for appellant (case no. A97A0306).

*Michael J. Bowers, Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen A. Sgrosso, Assistant Attorney General, Scott, Quarterman & Wells, Russell T. Quarterman, Adrienne R. McFall, Diane M. Riley*, for appellee.

