**FOURTH DIVISION**
**DOYLE, P. J.,**
**MILLER and DILLARD, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**October 30, 2014**

# In the Court of Appeals of Georgia

A14A0943. IN THE INTEREST OF J. V. J., A CHILD.

DILLARD, Judge.

The mother of a minor child, J. V. J., appeals from an order of the Juvenile Court of Houston County terminating her parental rights and its subsequent denial of her motion for a new trial, arguing that the court lacked clear and convincing evidence to support its finding that the cause of her child's deprivation was likely to continue. For the reasons set forth *infra*, we reverse.

Viewed in the light most favorable to the juvenile court's findings,[1] the evidence showed that J. V. J. was born on September 25, 2012, and was immediately removed from her mother's custody by the Department of Family and Children Services ("the Department") because her mother previously lost parental rights to

---

[1] *In the Interest of T. W.*, 297 Ga. App. 886, 886 (678 SE2d 546) (2009).

three other children and had a history of instability and drug use. Nine months later, on June 26, 2013, the juvenile court held a termination hearing, during which the mother admitted that she used crack cocaine two or three times per week for ten years. The mother contended, however, that her drug use ceased when she learned that she was pregnant with J. V. J. in March 2012.[2] Further, the mother testified that she had no relationship with five of her six children, and that her parental rights as to three of those children were terminated.

The mother visited J. V. J. regularly since her birth and, even though the Department never provided her with a case plan, she independently decided to attend a 15-week parenting course, complete an outpatient substance-abuse program, earn her high-school diploma, and enroll in college to become a medical assistant. Regarding her finances, the mother testified that she received a Pell Grant and student loans for school and, if J. V. J. were returned to her, that she could apply for temporary assistance for needy families. Further, the mother explained that she was trying to "get [her] life together and be a better mom" and, as she would be unable to have other children, she wanted to prove that she could care for J. V. J.

---

[2] There is no evidence that J. V. J. tested positive for cocaine at birth.

The evidence also shows that, although the mother had been unemployed for the last ten years,[3] she had lived in the same apartment for approximately two years (since July 18, 2011). The mother's boyfriend moved in with her shortly after J. V. J. was born, and he paid most of their living expenses. And while the mother and boyfriend knew that the boyfriend was not J. V. J.'s biological father, they nevertheless signed an acknowledgment of legitimacy, indicating that he was the father.

On September 27, 2012, two days after J. V. J.'s birth, the mother and her boyfriend tested positive for cocaine and, on May 21, 2013, the boyfriend tested positive a second time. Three weeks later, in June 2013, the boyfriend paid for an independent drug test and, this time, he tested negative for cocaine. The technician who administered the May test testified that the boyfriend's positive drug test in May showed a low level of cocaine, indicating that "he was trying to quit" or "cut down some." The evidence presented below further shows that, in March 2013, the boyfriend successfully completed a substance-abuse program.

---

[3] The mother testified below that she did "do a little cleaning up for her mother" in order to "make a little money."

3

The director of a women's rehabilitation center testified that the mother had enrolled in an outpatient substance-abuse program. And while she had been noncompliant in the past, the mother had done "exceptionally well" in the program this time. Indeed, she ceased using drugs in October 2012, and since then, tested negative for drugs 32 times. Moreover, when the mother completed the program, she enrolled in a support group for recovering addicts and participated in every program the center offers, including a job-readiness program.

A case manager testified that the Department did not develop a case plan for J. V. J. and, in fact, did nothing to assist the mother or work towards reunification. The case manager had no contact whatsoever with the substance-abuse program, but she nevertheless confirmed that the mother had been drug-free for at least 90 days preceding May 2013, when she tested negative for drugs. And when the case manager supervised visits, she noticed that the mother played with her child, bonded with her, and appeared to love her. Further, despite "transportation issues," the mother never missed a scheduled supervised visit with her daughter. Additionally, J. V. J.'s Court Appointed Special Advocate ("CASA") visited the mother's home, which included a room with a baby bed, diapers, and baby clothes, and she found it pleasant, moderately furnished, and clean. And based on the home visit and her contact with

4

J. V. J. and her mother, the CASA believed reunification was indeed an option and that the mother was able to care for the child.

J. V. J.'s foster mother testified that she adopted two of J. V. J.'s biological siblings, and that she and her husband desired to adopt J. V. J. as well. At the close of the hearing, J. V. J.'s guardian ad litem commended the mother, stating "[s]he's managed to completely turn her life around and it's very impressive." Nonetheless, she agreed with the Department's recommendation to terminate the mother's parental rights based on her boyfriend's "substance abuse issues."

On August 8, 2013, the juvenile court terminated the mother's parental rights. The court first found that the mother was not credible because she signed an acknowledgment falsely representing that her boyfriend was J. V. J.'s father. Moreover, the court determined that termination was warranted because the mother had a long history of chronic instability and drug abuse, and she lived with a man dependent upon cocaine. And noting that the mother's parental rights to three of her other children were terminated, the court found that she was unstable regarding her ability to meet J. V. J.'s needs, and that no evidence suggested she would ever develop that ability. The court was also adamant that J. V. J. "CANNOT live with [ ] [the mother's boyfriend]." Finally, the court concluded that it was in J. V. J.'s best

interests to terminate her mother's parental rights because "it would be unspeakably inhumane to the child to remove her from the [foster] home."

The mother then filed a motion for a new trial, arguing that the court lacked sufficient grounds for termination and that the Department failed to show instability. The court denied the motion, reiterating its initial findings. Thereafter, the mother filed an application for a discretionary appeal, which we granted. This appeal follows.

On appeal, the mother maintains that the juvenile court terminated her parental rights without clear and convincing evidence that the cause of J. V. J.'s deprivation, including the mother's past drug use and current poverty, was likely to continue or will likely not be remedied. We agree.

At the outset, we note that on appeal from a termination order, "we view the evidence in the light most favorable to the juvenile court's ruling and determine whether a rational trier of fact could have found by clear and convincing evidence that the parent's rights should have been terminated."[4] A juvenile court's termination of parental rights involves a two-step process.[5] The first step dictates a finding of

[4] *In the Interest of A. T.*, 316 Ga. App. 782, 784-85 (730 SE2d 451) (2012) (punctuation omitted).

[5] We note that Title 15 has been significantly revised by the General Assembly, with the revisions effective as of January 1, 2014. Ga. L. 2013, p. 294, Part V, §§ 1-5

parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) lack of proper parental care or control is the cause of the deprivation; (3) such cause of deprivation is likely to continue; and (4) the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child.[6] If these four factors are satisfied, the court must then determine whether termination of parental rights is "in the child's best interest, considering physical, mental, emotional, and moral condition and needs, including the need for a secure and stable home."[7]

Furthermore, it is well settled that termination of parental rights is a "remedy of last resort which can be sustained only when there is *clear and convincing*

---

("This Act shall become effective on January 1, 2014, and shall apply to all offenses which occur and juvenile proceedings commenced on and after such date."). However, we review the juvenile court's decision under the law that applied at the time of the court's decision, which is the former version of the statute.

[6] *See* OCGA § 15-11-94 (a), (b) (4) (A) (i)-(iv)*; In the Interest of D. W.*, 294 Ga. App. 89, 91 (1) (668 SE2d 533) (2008); *In the Interest of A. T.*, 316 Ga. App. at 784.

[7] *In the Interest of D. W.*, 294 Ga. App. at 91 (1) (punctuation omitted); *accord In the Interest of A. T.*, 316 Ga. App. at 784.

7

*evidence* that the cause of the deprivation is likely to continue."[8] As such, "compelling facts" are required to terminate parental rights.[9] And while the juvenile court may consider past parental conduct in deciding whether the cause of deprivation is likely to continue,[10] evidence of past unfitness, standing alone, is "insufficient to terminate the rights of a parent in her natural child."[11] Rather, clear and convincing evidence of *"present* unfitness is required."[12] Additionally, a parent's poverty alone is an insufficient basis to terminate parental rights.[13] Lastly, we have repeatedly

[8] *In the Interest of T. Z. L.*, 325 Ga. App. 84, 94 (1) (a) (751 SE2d 854) (2013) (punctuation omitted); *see also In the Interest of C. J. V.*, 323 Ga. App. 283, 287 (746 SE2d 783) (2013); *In the Interest of K. M.*, 240 Ga. App. 677, 680 (523 SE2d 640) (1999); *In the Interest of K. E. B.*, 190 Ga. App. 121, 124 (378 SE2d 171) (1989).

[9] *In the Interest of K. J.*, 226 Ga. App. 303, 306 (1) (486 SE2d 899) (1997) (punctuation omitted); *see also Carvalho v. Lewis*, 247 Ga. 94, 94 (274 SE2d 471) (1981); *In the Interest of S. M.*, 169 Ga. App. 364, 365 (1) (312 SE2d 829) (1983).

[10] *See In the Interest of D. W.*, 294 Ga. App. at 92 (1) (c); *In the Interest of A. H.*, 289 Ga. App. 121, 123 (1) (a) (656 SE2d 254) (2008).

[11] *In the Interest of C. J. V.*, 323 Ga. App. at 285 (punctuation omitted); *see also In the Interest of D. L. T. C.*, 299 Ga. App. 765, 769 (1) (684 SE2d 29) (2009).

[12] *In the Interest of C. J. V.*, 323 Ga. App. at 285 (punctuation omitted); *see also In the Interest of C. S.*, 319 Ga. App. 138, 145 (1) (735 SE2d 140) (2012); *In the Interest of T. Z. L.*, 325 Ga. App. at 94 (1) (a); *In the Interest of D. L. T. C.*, 299 Ga. App. at 769 (1).

[13] *See In the Interest of C. J. V.*, 323 Ga. App. at 286-87 (explaining that evidence that a mother is "unemployed, without prospects for future employment, and

recognized that "[t]he right to raise one's children is a fiercely guarded right in our society and law, and a right that should be infringed upon only under the most compelling circumstances."[14]

In the case *sub judice*, construing the evidence in the light most favorable to the termination order, we conclude that there was not clear and convincing evidence demonstrating that the cause of J. V. J.'s deprivation is likely to continue or will likely not be remedied.[15] Indeed, the undisputed evidence established the mother's substantial efforts to rehabilitate herself during the nine months preceding the

---

without any stable living arrangements" is an insufficient basis to termination her parental rights) (punctuation omitted)); *id.* at 291 (Dillard, J., concurring specially and fully) ("The State has no right to irrevocably sever the natural parent-child relationship simply because a parent is incapable of providing her children with an idyllic middle-class lifestyle."); *see also In the Interest of C. T.*, 286 Ga. App. 186, 190 (2) (648 SE2d 708) (2007).

[14]*In the Interest of C. J. V.*, 323 Ga. App. at 283 (punctuation omitted); *see also In Interest of J. C.*, 242 Ga. 737, 738 (1) (251 SE2d 299) (1978); *In the Interest of M. A.*, 280 Ga. App. 854, 856 (635 SE2d 223) (2006); *In the Interest of T. E. T.*, 282 Ga. App. 269, 269-70 (638 SE2d 412) (2006); *In the Interest of T. J. J.*, 258 Ga. App. 312, 314 (574 SE2d 387) (2002).

[15] Because the mother challenges only the juvenile court's finding that the cause of J. V. J.'s deprivation was likely to continue, we decline to address the other three factors required by OCGA § 15-11-94 (a), (b) (4) (A) (i)-(iv). *See In the Interest of T. J.*, 281 Ga. App. 308, 314-15 (2) (636 SE2d 54) (2006) (finding that appellant abandoned an argument on appeal when she provided no legal argument or citations to the record to support the argument); Court of Appeals Rule 25 (c) (2).

hearing.[16] Significantly, even without a reunification plan or any other support from the Department, the mother earned her high-school diploma, enrolled in college, completed a drug-rehabilitation program, and attended a 15-week parenting class. Such evidence belies the juvenile court's repeated assertions that there was *no evidence* that the mother would ever develop the ability to care for her child. And while the Department acknowledged the mother's continued sobriety and that, during supervised visits, she appeared to bond with and love her child, it inexplicably recommended termination without providing her any opportunity for reunification.[17]

---

[16] We acknowledge that the trier of fact, not the appellate court, should decide "what weight to give recent improvements" and "whether a parent's conduct warrants hope of rehabilitation." *See In the Interest of R. C. M.*, 284 Ga. App. 791, 799-800 (III) (3) (645 SE2d 363) (2007) (punctuation omitted). Nevertheless, even under this deferential standard, the juvenile court is not at liberty to terminate parental rights unless clear and convincing evidence supports its decision and, as discussed *infra*, such evidence is clearly lacking in this case. *See In the Interest of C. J. V.*, 323 Ga. App. at 287-288; *In the Interest of C. S.*, 319 Ga. App. at 148 (1); *In the Interest of M. T. F.*, 318 Ga. App. 135, 147-48 (1) (733 SE2d 135) (2012); *In the Interest of K. J.*, 226 Ga. App. at 307-08 (2) (b).

[17] While the Department is not required to issue a reunification plan when a parent's rights to other children have been terminated, *see In the Interest of R. B.*, 309 Ga. App. 407, 412-13 (1) (710 SE2d 611) (2011) (citing OCGA § 15-11-58(a) (4) (C) (reunification efforts are not required when the parent's rights to a sibling of the child have been terminated involuntarily)), it is unclear why the Department wholly ignored the mother's independent efforts to remain sober, develop parenting skills, and further her education. In so doing, the Department appears to have sought termination of her parental rights to J. V. J. based solely on her past unfitness to care for her other

Ignoring the mother's extended sobriety, enrollment in college, and pursuit of a career as a medical assistant, the juvenile court terminated her parental rights by relying heavily on her history of drug use and past instability with respect to her other children. However, as noted *supra*, evidence of past misconduct, without more, is insufficient to permanently sever the natural parent-child relationship.[18] And while the mother admitted a ten-year history of using cocaine, she tested negative for cocaine *thirty-two times*, enrolled in an after-care program to maintain her sobriety, and availed herself of every program that the treatment center offered. Indeed, the court cited *no evidence* suggesting that the mother had used drugs in the nine months before the hearing. Under these circumstances, the mother certainly provided more than mere "promises of good behavior" to show that she was not likely to continue engaging in her prior misconduct.[19] Thus, the court impermissibly relied upon the

---

children, which is flatly prohibited. *See In the Interest of C. J. V.*, 323 Ga. App. at 285 (evidence of past unfitness alone is insufficient to support a termination order).

[18] *See In the Interest of R. C. M.*, 284 Ga. App. at 799-800 (III) (3) (finding the juvenile court lacked clear and convincing evidence that the cause of the child's deprivation was likely to continue when termination of the father's parental rights was based on his past incarceration and his failure to meet the goals of the reunification plan within 45 days of his release).

[19] *See In the Interest of G. A. M.*, 302 Ga. App. 177, 179 (1) (c) (690 SE2d 472) (2010) ("The juvenile court must base its decision on more than positive promises of

mother's past drug use, while ignoring undisputed evidence of her present and well-documented commitment to sobriety.[20]

The record also fails to substantiate the juvenile court's finding that the mother's history of "chronic instability" justified terminating her parental rights. In so finding, the court cited only the mother's *past* instability, which resulted in losing her parental rights to three other children, while ignoring the above-detailed evidence of her significant efforts to turn her life around and develop the ability to care for J. V. J. by staying sober, attending parenting classes, and furthering her education.[21] Essentially, the juvenile court concluded that the mother's loss of parental rights to

good behavior which past conduct as proven will likely not be carried out.").

[20] *See In the Interest of C. J. V.*, 323 Ga. App. at 285 (evidence of past unfitness alone is insufficient to support a termination order); *In the Interest of T. Z. L.*, 325 Ga. App. at 94 (1) (a) (same).

[21] *See In the Interest of C. S.*, 319 Ga. App. at 146-48 (1) (finding that the juvenile court lacked clear and convincing evidence that the cause of the child's deprivation was likely to continue when, *inter alia*, the parent, on his own without any assistance from the Department, completed parenting and anger-management classes, attended AA and NA meetings, maintained his sobriety, maintained stable housing for a long time, and maintained regularly scheduled visitation with his children); *In the Interest of Marks*, 300 Ga. App. 239, 246-47 (3) (684 SE2d 364) (2009) (finding, in an adoption case, that there was insufficient evidence that the cause of the child's deprivation was likely to continue, when the parent, after being released from prison, completed a substance-abuse program and received significant occupational training).

12

her other children foreclosed the possibility that she could ever develop the ability to care for J. V. J. But at the time of the termination hearing, the evidence presented showed that the mother could indeed provide a stable and loving home environment for her child.[22] Indeed, the only witness to visit the home believed that the mother could adequately care for J. V. J. The mother also submitted evidence establishing that she was a full-time student, and testified that she received student loans and other federal assistance to support herself until she graduated. Regardless, as previously noted, poverty or unemployment alone is an insufficient basis to terminate parental rights;[23] and this is especially true when a parent's poverty and unemployment is due, in part, to pursuing educational opportunities.[24] Thus, as the juvenile court cited no compelling evidence that the mother is *presently* unstable, financially or otherwise,

---

[22]Although modestly furnished, the home had a designated room for the baby, with a baby bed, diapers, and baby clothes.

[23] *See In the Interest of C. J. V.*, 323 Ga. App. at 286-87.

[24] *Cf. In the Interest of M. T. F.*, 318 Ga. App. 135, 146 (733 SE2d 432) (2012) (crediting mother for being "a second-year college student . . . enrolled in on-line college courses").

it erred in terminating her parental rights, in part, based on her prior history of instability.[25]

Additionally, the mother's cohabitation with her boyfriend is an insufficient basis for terminating her parental rights. The juvenile court found that J. V. J. could not be placed in a home with a mother "who is wholly dependent on a cocaine abuser for support" and, without further explanation, it concluded that the child simply could not live with the boyfriend. Although the home that the mother shared with her boyfriend was pleasant, clean, and included a nursery for the baby, the juvenile court rejected it as a viable option for J. V. J. without citing any evidence, much less clear and convincing evidence, that the boyfriend's presence or even his potential drug use[26] would negatively affect J. V. J. if she were returned to her mother.[27] To the

---

[25] *See In the Interest of C. J. V.*, 323 Ga. App. at 285 (noting that "clear and convincing evidence of *present* unfitness is required" to support termination of parental rights) (emphasis supplied).

[26] While the court believed that the boyfriend was "dependent" on drugs, evidence showed that he successfully completed a drug rehabilitation program in March 2013, he had only two positive drug tests, and his most recent positive drug test revealed a low level of cocaine, suggesting that "he was trying to quit" or "cut down some."

[27] *See In the Interest of T. Z. L.*, 325 Ga. App. at 94 (1) (a) (termination of parental rights "can be sustained only when there is *clear and convincing evidence* that the cause of the deprivation is likely to continue") (punctuation omitted).

contrary, the evidence showed that the boyfriend helped J. V. J.'s mother maintain a stable home by contributing financially and supporting her considerable efforts to be a better mother to J. V. J. And while the boyfriend's history of past drug use is certainly troubling, no judicial determination is more drastic than the permanent severing of the parent-child relationship and, absent clear and convincing evidence[28] that the mother's cohabitation with her boyfriend would negatively affect J. V. J., termination of her parental rights is unwarranted.[29]

Furthermore, the juvenile court's finding that J. V. J. could not be returned to her mother because it would be "unspeakably inhumane" to remove the child from her foster home lacked evidentiary support. While we certainly appreciate that J. V. J. is thriving in her foster home, as well as the commendable care the foster parents are providing to two of her siblings, the juvenile court has no authority to sever the natural parent-child relationship simply because it believes the child would be better

---

[28] *Cf. In Interest of H. L. W.*, 229 Ga. App. 264, 264-67 (493 SE2d 637) (1997) (affirming the termination of parental rights when, *inter alia*, the mother was in a relationship with an abusive boyfriend who "beat the mother and 'french kissed' one of the children" and the children were "terrified" of the boyfriend).

[29] *See In the Interest of C. S.,* 319 Ga. App. at 145-48 (1) (finding insufficient evidence that the cause of the child's deprivation was likely to continue when, *inter alia*, no evidence showed that the parent's current home environment was unsuitable).

15

off with the foster family. Indeed, a court is not allowed to terminate a parent's natural right to familial relations with his or her child simply because it has determined that "the child might have a better financial, educational, or even moral advantages elsewhere."[30] Thus, the juvenile court's preference that J. V. J. remain with her foster family is wholly without consequence, when the court lacked clear and convincing evidence to terminate the natural mother's parental rights.[31]

---

[30] *Id.* at 146 (1) (punctuation omitted); *see also Dell v. Dell*, 324 Ga. App. 297, 300 (748 SE2d 703) (2013) (same).

[31] We note in passing that the juvenile court failed to provide sufficient support for its conclusory finding that J. V. J.'s continued deprivation would most likely result in physical, mental, moral, or emotional harm to the child. Indeed, the court did not identify *any* specific harm that J. V. J. would suffer if she were returned to her mother, instead merely reciting boilerplate language from OCGA § 15-11-94 (a), (b) (4) (A) (iv). Suffice it to say, this is not a sufficient basis to irrevocably sever the familial rights of the mother to her child. As we have previously emphasized, an order terminating parental rights must contain "explicit findings supporting the conclusion [ ] that by reason of the deprivation the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm." *In the Interest of K. J.*, 226 Ga. App. at 307 (2) (b). And absent such specific factual findings, we have no basis to consider whether the juvenile court properly determined that clear and convincing evidence supported its conclusion on that issue. *Id.* We take this opportunity to remind our juvenile courts of their obligation to include such explicit findings in their orders terminating parental rights.

16

In sum, no judicial determination has a more "drastic significance than that of permanently severing a natural parent-child relationship,"[32] and it must be scrutinized "deliberately and exercised most cautiously."[33] And because the evidence below did not clearly and convincingly establish that the cause of J. V. J.'s deprivation was likely to continue or will not likely be remedied, the juvenile court erroneously terminated the mother's parental rights.

For all of the foregoing reasons, we reverse.

*Judgment reversed. Doyle, P. J., and Miller, J., concur.*

---

[32] *In the Interest of R. C. M.*, 284 Ga. App. at 800 (III)(3); *accord In the Interest of K. J.*, 226 Ga. App. at 306 (1).

[33] *In the Interest of K. J.*, 226 Ga. App. at 306 (1).