**THIRD DIVISION**
**DILLARD, P. J.,**
**GOBEIL and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**July 2, 2019**

# In the Court of Appeals of Georgia

A19A0292. STATE OF GEORGIA v. DUNCAN et al.

HODGES, Judge.

In this wrongful death action, we must decide whether a party may sue the Georgia Department of Human Services (the "DHS"), following the death of child in its custody, when the child died in the care of a foster parent employed by a private child-placing agency[1] under contract with DHS. Celeste Morales and Ryan Duncan, the birth parents of Alexia Nevaeh Duncan (the "Parents"), sued the DHS, child-placing agency Lutheran Services of Georgia, Inc. ("Lutheran"), and Joyce and John Anderson (the "Andersons") after Alexia died in the Andersons' foster care. Relevant to this appeal, DHS moved to dismiss the Parents' case, contending that the

---

[1] "'Child-placing agency' means any institution, society, agency, or facility, whether incorporated or not, which places children in foster homes for temporary care or for adoption." OCGA § 49-5-3 (4) (2013).

Andersons were foster parents employed by Lutheran and that, as a result, they were not "state officers or employees" as defined by the Georgia Tort Claims Act (OCGA § 50-21-20 et seq.) or entitled to sovereign immunity.

The Superior Court of Jackson County denied the DHS's motion to dismiss.[2] The trial court entered a certificate of immediate review, and we granted the DHS's application for interlocutory appeal. After careful review, we conclude that the Andersons were acting as "foster parents" as that term is defined in our law and that parents who meet that statutory definition act on the DHS's behalf in caring for a child in its legal custody. Consequently, "foster parents" are "state officers or employees" under the Tort Claims Act, and the Andersons are personally entitled to sovereign immunity. In view of the Tort Claims Act's waiver of sovereign immunity

[2] The Andersons also filed a motion for summary judgment, arguing that the Tort Claims Act precluded a suit against them personally given their status as foster parents. In addition, the Parents filed a motion for partial summary judgment asserting that, "[t]o the extent the Andersons are found to be officers or employees of the [state] . . ., the [state] is liable as a matter of law for any and all negligent acts and omissions committed by the Andersons." Although the DHS did not enumerate as error the trial court's judgment on these motions, the legal issue presented by the parties is the same — specifically, whether the Andersons are "state officers or employees" as defined in the Tort Claims Act. As a result, our decision concerning the DHS's motion to dismiss would necessarily resolve the Andersons' motion for summary judgment as well. See generally OCGA § 9-11-60 (h) ("any ruling by the Supreme Court or the Court of Appeals in a case shall be binding in all subsequent proceedings in that case in the lower court").

2

as to the DHS, however, the Parents' claims against DHS are not precluded. Therefore, we affirm the judgment of the trial court denying the DHS's motion to dismiss.

As a threshold matter, "[t]he trial court's ruling on [a] motion to dismiss on sovereign immunity grounds is reviewed de novo, while factual findings are sustained if there is evidence supporting them." (Citation omitted.) *Ambati v. Bd. of Regents of the Univ. System of Ga.*, 313 Ga. App. 282, n. 3 (721 SE2d 148) (2011); see also OCGA § 9-11-12 (b) (1). So viewed, the evidence revealed that the Parents' daughter, Alexia, was born two months prematurely and suffered from multiple health issues, including apnea, which required constant monitoring. Due to her health issues, hospital staff designated Alexia as a "medically fragile" infant. Alexia remained in the hospital for over six weeks and, following training for the Parents by nursing staff, the hospital released her to the Parents on December 6, 2012.

On December 13, 2012, the Parents returned to the hospital with Alexia after she stopped breathing during a medical examination, and she was readmitted. The DHS, acting through the Athens-Clarke County Department of Family and Children Services ("DFCS"), obtained an order from the Juvenile Court of Athens-Clarke County awarding custody of Alexia to the DFCS, which began to look for qualified

foster parents.[3] Lutheran, a private child-placing agency with experience in placing medically fragile children with suitable foster parents, contracted with the DHS to provide foster care and indicated that it would be able to place Alexia with qualified foster parents. The Andersons have previously served as foster parents for medically fragile children, and Mrs. Anderson had experience as a nurse. After rejecting another potential foster parent, the DHS ultimately approved the Andersons to serve as Alexia's foster parents, and the hospital released Alexia to the Andersons on December 22, 2012.

On January 5, 2013, after feeding Alexia and giving her a bath, Mrs. Anderson placed Alexia in her car seat without her breathing machine and began to perform household chores throughout the house. While performing her chores, Mrs. Anderson checked on Alexia and noted that she showed "no sign of distress" and that her respiration and skin "looked good." Mrs. Anderson went to the restroom, washed her hands, and then heard Alexia making a gurgling sound. Mrs. Anderson rushed to Alexia's car seat and found Alexia's lips "blue" with no breathing or pulse. She attempted mouth-to-mouth resuscitation without success and telephoned 911. An

---

[3] The DHS is "authorized and empowered, through . . . the programs of county or district departments of family and children services" to establish certain programs, including the regulation of child-placing agencies. OCGA § 49-5-8 (a), (a) (6) (2013).

4

ambulance arrived some time later, but before the paramedics transported Alexia to a local hospital, one of them declared Alexia dead. Once at the hospital, medical staff were unable to revive Alexia.

The Parents filed suit against the DHS, the DFCS, Lutheran, and the Andersons for, among other things, negligence and professional negligence. The DHS moved to dismiss the Parents' case, asserting that the Andersons were foster parents employed by Lutheran rather than the DHS and that, as a result, they were not acting on behalf of the DHS or protected by sovereign immunity. The trial court denied the DHS's motion to dismiss, finding that the Andersons were "'state officers or employees' as defined by the [Tort Claims Act] and . . . are immune from suit as they were acting within the scope of their official duties at all times relevant to [the Parents'] Complaint." The trial court entered a certificate of immediate review, and we granted the DHS's application for interlocutory appeal. This appeal followed.

In a single enumeration of error, the DHS contends that "the trial court erred by denying [the] DHS's motion to dismiss because the Andersons were not state officers or employees who were acting on behalf of [the] DHS" at the time of Alexia's death. In its simplest form, the DHS's argument may be summarized thusly: the DHS contracted with Lutheran for foster care services, and Lutheran contracted

with the Andersons to serve as foster parents; therefore, the Andersons were acting on behalf of Lutheran rather than the DHS when Alexia died and, as a result, the DHS is entitled to sovereign immunity. We do not agree.

Under Georgia law, "[t]he doctrine of sovereign immunity shields the state from suits seeking to recover damages [because] . . . the primary purpose of sovereign immunity is to protect state coffers." *In the Interest of A. V. B.*, 267 Ga. 728 (1) (482 SE2d 275) (1997). Therefore, "[t]he sovereign immunity of the state and its departments and agencies can only be waived by an Act of the General Assembly which specifically provides that sovereign immunity is thereby waived and the extent of such waiver." Ga. Const. of 1983, Art. I, Sec. II, Par. IX (e). Enacted by the General Assembly in 1992, the Tort Claims Act supplies such a waiver, providing that

> [t]he state waives its sovereign immunity for the torts of *state officers and employees* while acting within the scope of their official duties or employment and shall be liable for such torts in the same manner as a private individual or entity would be liable under like circumstances; provided, however, that the state's sovereign immunity is waived subject to all exceptions and limitations set forth in this article. The state shall have no liability for losses resulting from conduct on the part of state

6

officers or employees which was not within the scope of their official duties or employment.[4]

(Emphasis supplied.) OCGA § 50-21-23 (a); see also *Dept. of Human Resources v. Johnson*, 264 Ga. App. 730, 732 (592 SE2d 124) (2003).

"State officer or employee" is defined as "an officer or employee of the state . . . acting on behalf or in service of the state in any official capacity, whether with or without compensation, but the term does not include an independent contractor doing business with the state."[5] OCGA § 50-21-22 (7). The definition of "state officer or employee" also specifically includes "foster parents and foster children." Id. Although "foster parent" is not separately defined in the Tort Claims Act, our Supreme Court has determined that it means "the person or persons who provide care, lodging, supervision, and maintenance in a foster care home *used by a*

---

[4] OCGA § 50-21-24 includes a list of thirteen exceptions to the state's waiver of sovereign immunity, none of which are relevant here.

[5] The exclusion for independent contractors simply recognizes the long-standing legal principle that "[a]n employer generally is not responsible for torts committed by his employee when the employee exercises an independent business and in it is not subject to the immediate direction and control of the employer." OCGA § 51-2-4.

*child-placing agency.*" (Emphasis supplied.) *Johnson v. Dept. of Human Resources*,

278 Ga. 714, 717 (3) (606 SE2d 270) (2004) (citing OCGA § 49-5-60 (11)).[6]

As a result, "[a] state officer or employee who commits a tort while acting

within the scope of his or her official duties or employment is not subject to lawsuit

or liability therefor." OCGA § 50-21-25 (a). Instead, "[a] person bringing an action

against the state under the provisions of this article must name as a party defendant

only the state government entity for which the state officer or employee was acting

and shall not name the state officer or employee individually." OCGA § 50-21-25 (b).

In this case, the DHS obtained legal custody of Alexia resulting from a juvenile

court proceeding.[7] Thereafter, Lutheran informed the DHS that it could care for

---

[6] "Foster care home" is itself defined as "a private home used by a child-placing agency which has been approved by the child-placing agency to provide 24 hour care, lodging, supervision, and maintenance for no more than six children who are unrelated to the foster parent or parents." *Johnson*, supra, 278 Ga. at 717 (3) (citing OCGA § 49-5-60 (10)).

[7] "'Legal custody' means a legal status created by court order embodying the following rights and responsibilities:

(A)　The right to have the physical possession of the child;
(B)　The right and the duty to protect, train, and discipline the child;
(C)　The responsibility to provide the child with food, clothing, shelter, education, and ordinary medical care; and
(D)　*The right to determine where and with whom the child shall live,*

8

Alexia and suggested the Andersons as foster parents. The DHS approved the Andersons to serve as Alexia's foster parents, and Alexia resided in the Andersons' home. Under these facts, Lutheran satisfied the definition of a "child-placing agency," the Andersons' residence qualified as a "foster care home," and the Andersons themselves met the definition of "foster parents." Accordingly, the Andersons were "state officers or employees" under the Tort Claims Act and are therefore entitled to sovereign immunity. It follows that the DHS, rather than the Andersons individually, is the proper party defendant in the Parents' action under the Tort Claims Act. See OCGA § 50-21-25 (b).

*Johnson* does not compel a different result. 264 Ga. App. at 730. In that case, a child in the joint custody of the Department of Human Resources[8] and the Department of Juvenile Justice died as the result of an accidental electrocution at a corporate child care institution. 264 Ga. App. at 730. The child's mother sued the departments and the house parent overseeing the institution for the child's wrongful

---

provided that these rights and responsibilities shall be exercised subject to the powers, rights, duties, and responsibilities of the guardian of the person of the child and subject to any residual parental rights and responsibilities." (Emphasis supplied.) OCGA § 49-5-3 (11) (2013).

[8] The Department of Human Resources was the predecessor to the DHS. See OCGA § 49-2-1 (a).

9

death. Id. The departments moved to dismiss the mother's action, arguing that sovereign immunity barred the action. Id. The trial court denied the motion, and the departments appealed. We reversed, holding that neither the child care institution nor the house parent were employees of the state. Id. at 732-736 (1). Relevant to this case, we specifically held that the house parent "was a child caring institution employee [and] not a foster parent" because the institution was "a child caring institution rather than a private foster home, and [the house parent] was employed by and provided care at [the institution] rather than in his own home. . . ."[9] Id. at 737 (2). Our Supreme Court affirmed, holding that because the institution

> did not meet the statutory definition of "foster home" contained in OCGA § 49-5-60 (10), [the institution's] employee did not meet the definition of "foster parent" and therefore did not fall within the

---

[9] A "child-caring institution means any institution, society, agency, or facility, whether incorporated or not, which either primarily or incidentally provides full-time care for children through 18 years of age outside of their own homes, subject to such exceptions as may be provided in rules and regulations of the board." OCGA § 49-5-3 (3) (2013). As a result, a child-caring institution is distinct from a foster care home. See OCGA § 49-5-60 (10) (Jan. 5, 2013) ("'Foster care home' means a private home used by a child-placing agency which has been approved by the child-placing agency to provide 24 hour care, lodging, supervision, and maintenance for no more than six children who are unrelated to the foster parent or parents."); *Johnson*, supra, 278 Ga. at 717 (3).

10

statutory definition of an "employee" for whose negligence the State has waived its sovereign immunity in the Georgia Tort Claims Act.

*Johnson*, supra, 278 Ga. at 717 (3). In this case, however, the Andersons were foster parents providing care for Alexia in their own home — after receiving Alexia's placement from Lutheran and, more importantly, approval from the DHS — rather than serving as employees of a child care institution. As a result, *Johnson* is inapposite.[10]

Our conclusion is buttressed by three additional factors. First, contrary to the DHS's argument, we do not find that the term "foster parent" is restricted to foster parents directly employed by the DHS. The statutory definition of "foster parent" contains no such limitation, and "[t]his court does not have the authority to impose such a limitation on the plain language of the statute." *Nat. Svcs. Indus. v. Transamerica Ins. Co.*, 206 Ga. App. 337, 339 (1) (425 SE2d 327) (1992); see also

---

[10] Similarly, the DHS's reliance upon *Hartley v. Agnes Scott College* is unavailing. 295 Ga. 458 (759 SE2d 857) (2014). In *Hartley*, our Supreme Court determined that campus police officers, though certified by the state to act as peace officers, were not "state officers or employees" under the Tort Claims Act "unless they are acting for an identified 'state government entity' when they commit an alleged tort[.]" Id.at 466-467 (2) (d). Specifically, the police officers, though state-certified, were employed by, and acting on behalf of, a private institution. Id. In this case, there is no such distinction, as the Andersons were approved by the DHS to serve as foster parents and cared for a child in the DHS's legal custody.

11

*Massey v. Allstate Ins. Co.*, 341 Ga. App. 462, 465 (1) (a) (800 SE2d 629) (2017) ("Nothing in the plain language of this statute suggests that the General Assembly intended to limit the [statutory] term . . ., and we see no reason why such a distinction should be read into the statute."). In fact, the definition recognizes that a "foster parent" may be employed by either the DHS directly or a child-placing agency without regard to the effect of such employment as to sovereign immunity.[11] See OCGA § 49-5-60 (10) (Jan. 5, 2013).

Second, our Code contains multiple provisions which reveal that foster parents, regardless of their employer, act on behalf of the DHS. For example, the Foster Parents Bill of Rights contains a legislative finding that "foster parents providing care for children *who are in the custody of [DHS]* play an integral, indispensable, and vital

---

[11] For this reason, the DHS's argument that its contract with Lutheran absolves it of liability is unpersuasive. It is true that the DHS has "meaningful statutory responsibilities for children placed in [its] custody, and [it] satisf[ies] those responsibilities by exercising reasonable care in the selection and supervision of [its] independent contractors." (Citation omitted.) *Johnson*, supra, 278 Ga. at 716 (2); see also OCGA § 49-5-12 (k) It is also true that child-placing agencies have a duty to "safeguard the welfare of . . . children" placed in foster homes. OCGA § 49-5-12 (j). However, these duties do not alter the plain language of the Tort Claims Act that foster parents are "state officers or employees" and that foster parents are "persons who provide care, lodging, supervision, and maintenance in a foster care home *used by a child-placing agency*," which may be either public or private. (Emphasis supplied.) *Johnson*, supra, 278 Ga. at 717 (3) (citing OCGA § 49-5-60 (11)).

12

role in the state's effort to care for dependent children displaced from their homes." (Emphasis supplied.) OCGA § 49-5-281 (a).[12]

Third, the General Assembly has made clear that the DHS retains legal custody of children, regardless of whether the children were placed in a foster home by a county department of family and children services or by a private child-placing agency. See OCGA §§ 49-5-3 (11) (2013), 49-5-9. At the outset, the DHS has the authority to contract with private agencies for the care of children. See OCGA § 49-5-9 (a). However, with that authority comes a statutory obligation "to inspect periodically all public and private institutions and agencies whose facilities [the DHS] is using." OCGA § 49-5-9 (b). Furthermore, the

> [p]lacement of a child or youth by the [DHS] in any institution or agency not operated by the [DHS] or the release of such child or youth from such an institution or agency *shall not terminate the control of the [DHS] over such child or youth.* No child or youth placed in such

---

[12] Furthermore, the State now affords some level of protection to all foster parents, regardless of their employer, by excluding "[r]ecords of the Department of Human Services concerning any foster parent" from disclosure under the Open Records Act. OCGA § 50-18-72 (21.1) (A) (2018). In that context, foster parents are defined as "individuals who were approved to serve in such capacity by the Division of Family and Children Services of the Department of Human Services *or a child-placing agency* licensed in accordance with Code Section 49-5-12. . . ." (Emphasis supplied.) Id. at (21.1) (B).

institution or under such an agency may be released by the institution or agency *without the approval of the [DHS]*.

(Emphasis supplied.) OCGA § 49-5-9 (c). Finally, "legal custody" includes "[t]he right to determine where and with whom the child shall live[.]" OCGA § 49-5-3 (11) (2013). In fact, evidence in this case confirmed that the DHS has to approve a placement "regardless of whether a child placement service is being . . . utilized" and that the DHS "still has duties and responsibilities owed" to a child in foster care regardless of "whether a child placement agency service is used. . . ." In short, evidence revealed that "even when a child placement agency is utilized, . . . [the DHS] ultimately [has] custody of the child during [the] whole time." Taken together, these factors confirm that DHS retains legal custody of children placed with foster parents by private child-placing agencies.

In sum, we conclude that the Andersons satisfied the statutory definition of "foster parents" and that their home qualified as a "foster care home." See OCGA §§ 49-5-60 (10), (11); *Johnson*, supra, 278 Ga. at 717 (3). Furthermore, the Andersons were acting on behalf of the DHS in their care for Alexia and, as a result, they were "state officers or employees" under the Tort Claims Act. See OCGA § 50-21-22 (7). Accordingly, the Parents' wrongful death action is proper against the DHS directly

14

because the state has waived sovereign immunity under these circumstances. See OCGA §§ 50-12-23(a), 50-12-25 (b). For the foregoing reasons, we affirm the judgment of the trial court denying the DHS's motion to dismiss.[13]

*Judgment affirmed. Gobeil, J., concurs. Dillard, P. J., concurs fully and specially.*

---

[13] We need not consider the DHS's argument that the trial court erred in denying its motion to dismiss the Parents' claim against Mrs. Anderson for professional negligence because it was not separately enumerated as error. See *Smyrna Dev. Co. Whitener Ltd. Partnership*, 280 Ga. App. 788, 790 (1) (635 SE2d 173) (2006) ("a party cannot expand his enumerations of error through argument or citation in his brief") (citation and punctuation omitted). In addition to the failure to enumerate the argument as error, the argument is deemed abandoned given the lack of meaningful argument and appropriate citations of authority in support of the argument. Id.; see also Court of Appeals Rule 25 (c) (2).

A19A0292.  STATE OF GEORGIA v. DUNCAN et al.

DILLARD, Presiding Judge, concurring fully and specially.

State actors routinely inject themselves into the private realm of family life[1] to—ostensibly—protect our children. This is no small thing. Parents are the natural protectors of their children, not government officials.[2] But there are, unquestionably,

---

[1] The family has rightly been characterized as the "first and vital cell of society." Richard W. Garnett, *Taking Pierce Seriously: The Family, Religious Education, and Harm to Children*, 76 NOTRE DAME LAW REV. 109, 114 (I) (2000) (punctuation and citation omitted).

[2] *See, e.g., Prince v. Massachusetts*, 321 U.S. 158, 166 (64 SCt 438, 88 LEd 645) (1944) ( "[T]he custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 535 (45 SCt 571, 69 LEd 1070) (1925) ("[T]hose who nurture [the child] and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for

2

cases and compelling circumstances that warrant state intrusion into the parent-child relationship.[3] This is such a case. Here, the State had legitimate, serious concerns about the welfare of Alexia Duncan, and it intervened to take custody of the child to ensure her safety. All of this is well and good, and I find no fault in the State's decision to do so. What I do take issue with is the State using its decision to contract out its responsibility to care for Alexia to a child-placing agency, as well as a strained interpretation of OCGA § 50-21-22 (7), as a means of washing its hands of any

---

additional obligations." (emphasis added)); *see also* Garnett, *supra* at 132 (III) ("Surely, the attitude toward a child that best reflects an appreciation for her dignity as a human person is not the disembodied paternalism of a government functionary, or even the genuine concern of a well-meaning case-worker, but the love of a parent. A parent loves this child; the Government[ ] [and] its experts . . . , try as they might, most likely do not. A parent has a moral obligation to nurture and protect this child, this child who can only be, to the Government, simply a particular manifestation of an abstraction—'children'—whose best interests the State has charged itself with advancing. Parental control is a this-child-centered, truly personalist, value, while state control . . . respects the personhood of children only if one believes that there is something dignified about being regarded by a hubristic state as a policy datum to be manipulated . . . in accord with best-interests generalities." (footnotes omitted))

[3] *See, e.g., In the Interest of J. V. J.*, 329 Ga. App. 421, 425 (765 SE2d 389) (2014) ("[W]e have repeatedly recognized that '[t]he right to raise one's children is a fiercely guarded right in our society and law, and a right that should be infringed upon only under the most *compelling circumstances*") (emphasis supplied) (citation omitted); *see* Garnett, *supra* at 114 (I) ("[S]tate functionaries, guided and restrained by a proper humility about their authority and competence, should meddle with [parental decisions] only to prevent harm, very carefully defined, to a child.").

3

responsibility for this child's death. This is an extraordinary position for the State to take, and I confess myself disappointed that it chose to do so. Suffice it to say, I fully concur in the majority's thoughtful and well-reasoned opinion.