**THIRD DIVISION**
**DILLARD, P. J.,**
**GOBEIL and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 22, 2019**

# In the Court of Appeals of Georgia

A19A0966. IN THE INTEREST OF V. G., a child.

HODGES, Judge.

The mother of two-year-old V. G. appeals the juvenile court's order finding V. G. to be a dependent child and granting temporary custody to the Fulton County Department of Family and Children Services (the "Department"). The mother argues that the juvenile court lacked the requisite clear and convincing evidence to support its findings that (1) V. G. is a "dependent child" within the meaning of OCGA § 15-11-2 (22), (2) the mother is an unfit parent, and (3) the Department took reasonable efforts to preserve or reunify the family pursuant to OCGA § 15-11-202. Because the evidence is insufficient to support a finding that the mother has lost her right to custody of the child, we reverse.

The record shows that V. G. was born on April 7, 2017. He has a pediatrician, is current on vaccinations, and does not have special needs. The mother's involvement with the Department began around August 21, 2018, when the mother contacted a community agency seeking help because she did not have adequate housing. The agency referred her to the Department, and the mother was "compliant" and "cooperative" as the Department assisted her in getting into a shelter. The Department case manager testified that when she saw V. G., he was appropriately clothed and not underweight or malnourished. According to the case manager, V. G. was "appropriately bonded" with his mother: she "interacted with him appropriately," and he "reache[d] for her and look[ed] to her for comfort." The mother receives $750 in social security income benefits each month and $190 in food stamps.

The mother subsequently lost her shelter bed after missing curfew because her bus was late. The mother contacted "a lot" of shelters, but was unable to secure a spot, so she went to Grady Hospital to request help from a social worker that she had previously seen a number of times. The Grady social worker reported the incident to the Department. Concerned with the mother's lack of stable housing and a comment the mother made about being overwhelmed, the Department filed a dependency complaint on September 7, 2018. Although housing was the primary safety concern

prompting removal, and the Department conceded at the dependency hearing that "at the time of the removal [the mother's] mental health was not a concern[,]" the Department's dependency complaint nonetheless listed concerns regarding the mother's alleged bipolar schizophrenia diagnosis, a potential mental breakdown by the mother, and an older child in foster care.

On September 10, 2018, the juvenile court issued a dependency removal order, finding as follows: "Mother requested that [the] child come into care as she is feeling overwhelmed due to an untreated/unmedicated diagnosis of bipolar-schizophrenia; mother has no housing and recently lost her bed [at] a homeless shelter." Based on these findings, the juvenile court concluded that removing V. G. from his mother's care was necessary to protect him, and the court awarded custody to the Department. The Department decided there would be no reunification plan for the mother.

Four days later, the Department filed a dependency petition, and the juvenile court held a hearing on the matter on September 24, 2018. Two witnesses testified at the hearing: the Department case manager and the mother. Regarding housing, the mother testified, and the child's advocate confirmed, that the mother and V. G. could stay with the mother's sister until they found another place to stay. When initially asked, the Department case worker indicated at the dependency hearing that the

mother's sister was not willing to be a resource for the child. However, later during the hearing, the case worker conceded that V. G.'s mother's sister recently stated she was willing to be a resource, but the Department had not had time to follow-up with her. The mother's sister did not testify at the hearing, but, according to the case worker, "if [the mother's] sister, the maternal aunt, was willing and able to be a placement resource, [that would] resolve the issue with the Department in regards to [the mother and the child] having housing." The juvenile court, however, concluded in its dependency order that the mother was unable to provide an adequate home, finding her claim that the mother's sister was an available placement resource for her and the child to be "not . . . credible."

As for the mother's alleged mental health issue, the diagnosis, if any, is unclear from the record. The mother allegedly reported to the case manager that she had been diagnosed by her school as "schizophrenic bipolar" when she was approximately three or four years old, but the mother also stated that she had never had the diagnosis confirmed or taken medication for any mental health disorder. The case manager admitted that she does not have any information regarding the mother's diagnosis or any proof confirming that the mother has been diagnosed with or treated for any mental health issue. Moreover, the Department did not present expert testimony on

4

the alleged diagnosis or otherwise show that the mother suffered from any symptoms of a mental health condition.

The mother's attorney and the child's advocate both argued at the dependency hearing that the Department had not met its burden of proof. According to V. G.'s child advocate, the mother

> came to the Department for assistance and it seems like we're penalizing her for coming to the Department for assistance. This child is one year old. There's no evidence there have been any harm or hurt to this child. . . . And the safety concerns that they're saying, there is just no evidence that matches that. At the preliminary protective hearing there was no mention that mental health was even an issue; it said that Mom was overwhelmed and that she didn't have housing. Homelessness alone and poverty alone is not enough to keep removing children. . . . I think [the mother] does deserve the ability and the opportunity to continue to parent her child.

The juvenile court, nevertheless, found V. G. dependent, transferred custody to the Department, and found the Department made reasonable efforts to eliminate the need to remove the child from his home and to reunify the child with his family. The mother appeals.

1. In two related enumerations of error, the mother argues that the juvenile court lacked clear and convincing evidence to sustain a finding that V. G. is a dependent child under OCGA § 15-11-2 (22) or that she is an unfit parent. Because

"parental unfitness is essential to support an adjudication of [dependency]," *In the Interest of D. H. D.*, 289 Ga. App. 32, 35 (656 SE2d 183) (2007) (citation omitted),[1] we have consolidated these issues to facilitate our analysis.

Under OCGA § 15-11-2 (22), a "dependent child" is defined as a child who (a) has been abused or neglected and is need of the protection of the court; (b) has been placed for care or adoption in violation of law; or (c) is without his or her parent, guardian, or legal custodian. A juvenile court "may place a minor child in the protective custody of the Department where the [Department] shows, by clear and convincing evidence, that the child is a 'dependent child.'" (Citation omitted.) *In the Interest of H. B.*, 346 Ga. App. 163, 164 (1) (816 SE2d 313) (2018).

> On appeal from an order finding a child to be a dependent child, we
> review the juvenile court's finding of dependency in the light most
> favorable to the lower court's judgment to determine whether any
> rational trier of fact could have found by clear and convincing evidence
> that the child is dependent. In making this determination we neither
> weigh the evidence nor judge the credibility of the witnesses, but instead
> defer to the factual findings made by the juvenile court, bearing in mind

---

[1] Given the similarities between the definition of a "deprived child" under the former Juvenile Code and that of a "dependent child" under the current Juvenile Code, "our previous decisions addressing the deprivation of a child are relevant to appeals involving the dependency of a child." See *In the Interest of S. C. S.*, 336 Ga. App. 236, 244, n. 4 (784 SE2d 83) (2016).

6

that the juvenile court's primary responsibility is to consider and protect the welfare of a child whose well-being is threatened.

(Citation and punctuation omitted.) *In the Interest of R. D.*, 346 Ga. App. 257, 259 (1) (816 SE2d 132) (2018).

> Proof of parental unfitness must also be [by] clear and convincing [evidence]. This standard of review safeguards the high value society places on the integrity of the family unit and helps eliminate the risk that a factfinder might base his determination on a few isolated instances of unusual conduct or idiosyncratic behavior. Only under compelling circumstances found to exist by clear and convincing proof may a court sever the parent-child custodial relationship.

(Citations omitted.) *In the Interest of E. M.*, 264 Ga. App. 277, 278 (590 SE2d 241) (2003).

In this case, the juvenile court's order is awkwardly worded and confusing.[2] In the "Conclusions of Law" section of the order, the court states that the child is dependent "in that he is without his parent, guardian or legal custodian." There is no mention in the court's conclusions of abuse, neglect, or failure by the mother "to provide proper parental care or control, subsistence, education as required by law, or

---

[2] This order was prepared and presented by an attorney on behalf of a special assistant attorney general working for the Department.

7

other care or control necessary for a child's physical, mental, or emotional health or morals[,]" which is the definition of "neglect." OCGA § 15-11-2 (48) (A). In the "Findings of Fact" section of the order, however, the court's findings all address neglect, not dependency based on a child being without his parent, guardian, or legal custodian. The order indicates that the child

> is in need of the protection of the Court due to being without proper parental care and supervision and is dependent as that term is defined in OCGA § 15-11-2(22) due to the following conditions:
>
> 1. Said child is without proper parental care, control or supervision in that;
>
> 2. The mother is without a home of her own and is unable to provide stable housing for the child; the mother secured placement in a shelter but lost the placement by not returning to the shelter in time to preserve her bed; the mother testified that she and the child could move in with the aunt immediately; however, the case manager testified that upon arriving at court the mother asked the case manager if the case manager had found a place for the mother to stay; the aunt, who previously declined to be a placement, was not present in court to confirm that her home was available;
>
> 3. The mother reported to the Department that she is diagnosed with Bipolar Schizophrenia;
>
> 4. The mother refuses to submit to evaluations to determine the status of her mental health;

8

5. The mother has an open dependency case in DeKalb County, GA involving a sibling of the child . . . ;

6. The mother reported to the Department that she was overwhelmed and could no longer care for the child . . . ; at a subsequent Family Team Meeting (FTM), the mother became hostile and walked out of the room stating she was not going to be compliant with the Department's efforts;

7. The mother is unable to provide adequate care, control or supervision of the child;

8. The mother is unable to provide an adequate home, care or support for the child; the mother has visited Grady Hospital three (3) to four (4) times in the last six (6) months seeking assistance but has not accepted any mental health services; the court does not find credible the mother's claim that the aunt is an available placement resource for herself and the child; . . . .

Based on these findings, it is clear the juvenile court concluded that V. G. was dependent based on neglect. Nonetheless, even if we give the court's findings of fact the appropriate deference they deserve, the record lacks clear and convincing evidence that the mother neglected V. G. or that she is an unfit parent.

(a) Turning first to the issue of neglect, the dependency hearing testimony and the juvenile court's order focused primarily on the mother's lack of stable housing and mental health. However, the findings on those factors fall short of presenting clear and convincing evidence of "egregious conduct or evidence of past egregious

9

conduct of a physically, emotionally, or sexually cruel or abusive nature by a parent toward his or her child or toward another child of such parent" – factors to be considered in determining whether a child is without proper parental care or control. (Citation and punctuation omitted.) *In the Interest of H. B.*, supra, 346 Ga. App. at 165 (1). In addition,

> [o]rdinarily, findings of fact by trial courts sitting without a jury are binding on appeal. But, where findings of fact are 'clearly erroneous,' or wholly unsupported by the evidence, they may be set aside. And [i]f the court's judgment is based upon a stated fact for which there is no evidence, it should be reversed.

(Citations and punctuation omitted.) *In the Interest of C. R. M.*, 179 Ga. App. 38 (345 SE2d 141) (1986).

Although the mother has had trouble finding stable housing, the record indicates that she has made efforts to reach out and receive assistance, and she ultimately located a suitable house for her and the child. The mother testified at the dependency hearing that her sister, V. G.'s aunt, could provide them with housing, at least temporarily. As a result, the juvenile court's finding that the mother is unable to provide stable housing for the child is contrary to the evidence. While the court's order states that the court did not find the mother's testimony in this regard credible, even the child's advocate stated that the maternal aunt was willing to be a resource

10

to house the mother and V. G., and the case manager conceded that V. G.'s maternal aunt recently stated she was willing to be a resource, but the Department had not had time to follow-up with her. The case worker further agreed that "if [the mother's] sister, the maternal aunt, was willing and able to be a placement resource, [that would] resolve the issue with the Department in regards to [the mother and the child] having housing." Given the testimony at the dependency hearing, we find no clear and convincing evidence of neglect based on the mother's lack of stable housing.

As for the court's emphasis on the mother's potential mental health diagnosis,

[i]t is true that, in determining whether a child is without proper parental care or control, and thus a "[dependent] child," a court may consider a medically verifiable deficiency of the parent's physical, mental, or emotional health of such duration or nature as to render the parent unable to provide adequately for the physical, mental, emotional, or moral condition and needs of the child.

(Citation and punctuation omitted.) *In the Interest of C. D. E.*, 248 Ga. App. 756, 764 (2) (546 SE2d 837) (2001). However, here there is no evidence in the record verifying that the mother has been diagnosed with any mental health disorder. The only evidence of an alleged mental health diagnosis is the mother's statement to the Department that she had been diagnosed by her school as "schizophrenic bipolar" when she was approximately three or four years old, but the mother also stated that

11

she had never had the diagnosis confirmed or taken medication for any mental health disorder. The Department did not present expert testimony on the issue, and the case manager admitted she does not have any information regarding the mother's diagnosis or any proof confirming that the mother has been diagnosed with or treated for any mental health issue.[3]

Moreover, even assuming that the mother has a mental health diagnosis, "the court completely failed to discuss how such condition was relevant to a finding of [dependency]." *In the Interest of C. D. E.*, supra, 248 Ga. App. at 764 (2).

> [N]either [the court's] initial order nor the two witnesses who testified . . . explained the meaning of that diagnosis. The record is devoid of any evidence describing what the behavior is or how it might limit [the mother's] parental abilities. So even though there may have been such a diagnosis, there is no evidence of a medically verifiable mental or emotional deficiency that renders [the mother] unable to provide for the needs of her child.

---

[3] The cases the Department relies on are inapposite. See *In the Interest of D. H. D.*, supra, 289 Ga. App. at 32-33 (affirming termination of parental rights in part because the mother was outside in a towel "hallucinating" and "talking to a spirit," which she conceded "possibly could tell her to harm her child."); *In the Interest of M. D.*, 283 Ga. App. 805, 806 (642 SE2d 863) (2007) (affirming depravation finding in part because the mother claimed to have been "attacked by spirits . . . and had been outside attempting to fight them off" while her child was inside alone).

12

*In the Interest of A. G. I.*, 246 Ga. App. 85, 87-88 (2) (a) (539 SE2d 584) (2000). There is no evidence that the mother is suffering from any mental health symptoms that affect her parenting ability or cause her to neglect her child. In fact, mental health issues were not even a concern at the time of the child's removal, and the case manager testified that, but for the mother's actions in a meeting following the child's removal, the mother was cooperative and compliant.

The fact that the mother refuses to submit to mental health evaluations does not, without more, support a finding of neglect, especially in light of the lack of evidence that any alleged mental health disability has caused or contributed to the child's neglect or the mother's ability to parent. See generally *In the Interest of K. S.*, 271 Ga. App. 891 (611 SE2d 150) (2005) (reversing deprivation finding where there was no reliable or competent evidence of mother's present mental impairment or evidence that any purported condition affected her ability to parent her child). Given the testimony at the dependency hearing, we find no clear and convincing evidence of neglect based on any alleged mental health issue of the mother.

Likewise, the fact that the mother has an open dependency case for an older sibling does not necessarily lead to a finding of neglect. Although this fact may indicate that the mother potentially would be unable to care for V. G., see *In the*

13

*Interest of S. L. B.*, 265 Ga. App. 684, 688 (1) (595 SE2d 370) (2004), "[t]he [Department] must present evidence of present [dependency], not past or potential future [dependency]." (Citation and punctuation omitted.) *In the Interest of R. S. T.*, 323 Ga. App. 860, 863 (748 SE2d 498) (2013). Here, it failed to do so.

The juvenile court's order also highlights that the mother felt "overwhelmed," and the Department repeatedly asserts in its appellate brief that the case worker believed V. G. was in immediate danger and an emergency request for protective custody needed to be filed when the mother told a Grady social worker she was overwhelmed and needed assistance. However, the case worker never testified at the dependency hearing regarding the mother's mental state at the time she spoke with the Grady social worker or offered evidence that the mother's feelings of being overwhelmed were permanent or immediately harmful to the child. See, e.g., *In the Interest of K. A. W.*, 133 SW3d 1, 13 (VI) (B) (Mo. 2004) ("Feeling overwhelmed in this context is not an indication of emotional instability, nor is it child abuse; rather, it is normal."). Moreover, no evidence was presented that at the time of the dependency hearing the mother still felt overwhelmed and unable to care for the child.

14

(b) As for the mother's fitness as a parent, the record is uncontroverted that the mother was taking care of V. G. and providing for his needs. At the time of removal, V. G. was current on vaccinations, appropriately clothed, not underweight or malnourished, and "appropriately bonded" with his mother. The record is devoid of any evidence that V. G. has been harmed by any instability in housing or alleged mental health issue of his mother.

It is well-established that a juvenile court is not authorized to remove a child from a parent, even temporarily,

> unless clear and convincing evidence exists that the [dependency] resulted from unfitness on the part of the parent, that is, either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child.

(Citation and punctuation omitted.) *In the Interest of A. J. H.*, 325 Ga. App. 848, 852 (755 SE2d 241) (2014).

Reviewed in a light most favorable to the juvenile court's judgment, the record in this case lacks clear and convincing evidence to support the court's conclusion that V. G. is a dependent child within the meaning of OCGA § 15-11-2 (22). Although the mother's inability to secure stable housing serves neither her nor her child's best

15

interests, "it in no way constitutes intentional or unintentional misconduct resulting in abuse or neglect of the child." *In the Interest of E. M.*, supra, 264 Ga. App. at 281; see also *In the Interest of C. J. V.*, 323 Ga. App. 283, 286-287 (746 SE2d 783) (2013) ("poverty alone is not a basis for termination") (citation omitted). In addition, pretermitting whether the mother has a mental health diagnosis, the record is devoid of any evidence that the mother is physically or mentally incapable of caring for her child.

Moreover, even if the evidence is sufficient to show that V. G. is dependent, it is wholly insufficient to establish that the mother is unfit. The record shows that the mother is willing to provide her son with the care that the law requires, even reaching out for assistance when necessary. And, the Department presented no evidence that V. G. has suffered any harm or ill effects at the hands of his mother.

"While we cannot say that the facts in this case would never merit a finding of [dependency], under these circumstances, where the [Department has] failed to demonstrate harm to the child, clear and convincing evidence of [dependency] has not been established." (Citation and punctuation omitted.) *In the Interest of A. J. H.*, supra, 325 Ga. App. at 853. We reiterate that "[t]he right to the custody and control of one's child is a fiercely guarded right in our society and in our law. It is a right that

16

should be infringed upon only under the most compelling circumstances." (Citation and punctuation omitted.) *In re S. E. H.*, 180 Ga. App. 849, 851 (350 SE2d 833) (1986).

> [I]n order to justify even a temporary transfer of custody, the [dependency] must be based upon the unfitness of the parent. Here, there was no competent evidence presented that the mother was unfit to care for her child, and that [V. G.] was a [dependent] child at the time of the [dependency] hearing. Accordingly, the juvenile court erred in removing the child from the mother's custody and transferring custody to [the Department].

*In the Interest of K. S.*, supra, 271 Ga. App. at 894.

2. In light of our disposition on the merits of this case, we need not address the remaining enumerated errors.

*Judgment reversed. Gobeil, J., concurs, Dillard, P. J., concurs fully and specially.*

A19A0966. IN THE INTEREST OF V. G., a child.

DILLARD, Presiding Judge, concurring fully and specially.

As President Ronald Reagan once quipped, "[t]he nine most terrifying words in the English language are: I'm from the Government, and I'm here to help."[1] V. G.'s mother learned this the hard way when she sought the government's assistance in securing suitable housing for her and her young son. Big mistake.

Rather than actually help, the Department of Family and Children Services filed a dependency complaint against a caring mother and took custody of her child

---

[1] President Ronald Reagan, The President's News Conference (Aug. 12, 1986), Ronald Reagan Presidential Foundation & Institute, *text available at* https://www.reaganfoundation.org/media/128648/newsconference2.pdf (last visited Oct. 15, 2019).

because she was poor, possibly had some (undiagnosed) mental-health challenges, and confessed to a social worker that she was "feeling overwhelmed." To add insult to injury, DFCS decided that it would not attempt to reunify V. G. with his mother. The government did this even though the mother was (1) "appropriately bonded" to her son; (2) caring for her son, and the child appeared well-fed and clothed; (3) able to stay with her sister until they found another place to live; and (4) "compliant" and "cooperative" in her dealings with the agency. As V. G.'s child advocate aptly noted below, DFCS essentially "penalized" the mother for being homeless and seeking government assistance.

The child advocate was exactly right. V. G.'s mother turned to DFCS for help because she wanted to be a better parent and provide for her child. And to do these things, she placed her trust in an agency that many parents avoid because they, understandably, fear that their children will be taken away. In this case, DFCS justified those fears, living up to its own worst example of government overreach.

Suffice it to say, I agree with the majority that—even after giving the juvenile court's findings of fact the appropriate amount of deference—the record does not contain clear and convincing evidence demonstrating that the mother neglected V. G. or is an unfit parent.[2] Even so, I write separately to express my concerns about the deeply troubling nature of this case and to, once again, remind the State and our juvenile courts of the solemn obligation they have to respect the private realm of family life[3] and take seriously the fundamental right of familial relations.[4]

---

[2] I concur fully in the majority's thoughtful and well-reasoned opinion. As a result, it may be cited as binding precedent. *See* Court of Appeals Rule 33.2 (a) (1).

[3] *See Prince v. Massachusetts*, 321 U. S. 158, 166 (64 SCt 438, 88 LEd 645) (1944) (noting that there is a "private realm of family life which the state cannot enter"); *State v. Duncan*, ___ Ga. App. ___ (831 SE2d 4, 10 n.1) (2019) (Dillard, P.J., concurring fully and specially) (noting that "[t]he family has rightly been characterized as the first and vital cell of society" (citation and punctuation omitted)); *see also* Richard W. Garnett, *Taking Pierce Seriously: The Family, Religious Education, and Harm to Children*, 76 NOTRE DAME LAW REV. 109, 114 (I) (2000).

[4] *See In the Interest of M. F.*, 298 Ga. 138, 144-45 (2) (780 SE2d 291) (2015) ("The presumption that children ordinarily belong in the care and custody of their parents is not merely a presumption of the statutory and common law, but it has roots in the fundamental constitutional rights of parents. The Constitution secures the fundamental right of parents to direct the upbringing of their children, and it protects a private realm of family life which the state cannot enter without compelling justification." (punctuation & citation omitted)); *see also* Garnett, *supra* at 132 (III) ("Surely, the attitude toward a child that best reflects an appreciation for her dignity as a human person is not the disembodied paternalism of a government functionary, or even the genuine concern of a well-meaning case-worker, but the love of a parent. A parent loves this child; the Government[ ] [and] its experts . . . , try as they might,

3

The liberty interest of parents to direct the upbringing, education, and care of their children is the most ancient of the fundamental rights we hold as a people and is "deeply embedded in our law."[5] This cherished right derives from the natural order,[6] preexists government,[7] and may not be interfered with by the State except in

most likely do not. A parent has a moral obligation to nurture and protect this child, this child who can only be, to the Government, simply a particular manifestation of an abstraction—'children'—whose best interests the State has charged itself with advancing. Parental control is a this-child-centered, truly personalist, value, while state control . . . respects the personhood of children only if one believes that there is something dignified about being regarded by a hubristic state as a policy datum to be manipulated . . . in accord with best-interests generalities." (footnotes omitted)).

[5] *Patten v. Ardis*, 304 Ga. 140, 141 (2) (816 SE2d 633) (2018).

[6] *Id.* ("More than a hundred years ago, this Court identified [the right of parents to the care, custody, and control of their children] as among the inherent rights that are derived from the law of nature."); *see Sloan v. Jones*, 130 Ga. 836, 847 (62 SE 21) (1908), *superceded by statute on other grounds as recognized by Proctor v. Proctor*, 164 Ga. 721 (139 SE 531) (1927); *Moore v. Dozier*, 128 Ga. 90, 93-94 (57 SE 110) (1907); *Rives v. Sneed*, 25 Ga. 612, 622 (1858); *see also Buchanan v. Buchanan*, 170 Va. 458, 471-72 (197 SE 426) (1938) ("The wants and weakness of childhood render maintenance by some one other than the child himself indispensable, and the voice of nature indicates the parent . . . as the fittest person to afford it. The duty of maintenance on the part of [parents] in respect to their *infant* children is, therefore, a principle of *natural law,* the right to which, on the part of such children, is insisted upon as a *perfect right* by the most eminent authorities, as, amongst others, by Puffendorf and Montesquieu. The municipal laws of all well regulated societies take care to enforce this duty; though Providence has done it more effectually by implanting in the heart of every parent that unquenchable affection which not even the deformity of person and mind, nor the wickedness, ingratitude, and rebellion of children can totally extinguish." (punctuation omitted)); 1 ST. GEORGE TUCKER, BLACKSTONE'S COMMENTARIES WITH NOTES OF REFERENCE TO THE CONSTITUTION

4

the most compelling circumstances.[8] The State and our juvenile courts must be mindful, then, in *every case* involving parental rights that—regardless of any perceived authority given to them by a state statute to interfere with a natural parent's custodial relationship with his or her child—their authority is *only* authorized if it comports with the long-standing, fundamental principle that "[p]arents have a constitutional right under the United States and Georgia Constitutions to the care and

---

AND LAWS OF THE FEDERAL GOVERNMENT OF THE UNITED STATES AND THE COMMONWEALTH OF VIRGINIA 46 (Birch & Small 1803) (noting that "single families . . . formed the first natural society, among themselves").

[7] *See, e.g.*, *In Interest of E. G. L. B.*, 342 Ga. App. 839, 848 (1) (805 SE2d 285) (2017); *accord In the Interest of C. H.*, 343 Ga. App. 1, 18 (805 SE2d 637) (2017) (Dillard, C. J., concurring fully and specially); *In the Interest of R. S. T.*, 345 Ga. App. 300, 315-16 (812 SE2d 614) (2018) (Dillard, C. J., concurring fully and specially) ("The liberty interest parents have in familial relations with their children is a natural-law right that has been enshrined in our positive law. It is a right that preexists government and one that we retain as a people separate and apart from any statute or constitution." (citations and punctuation omitted)).

[8] *See In the Interest of D. M.*, 339 Ga. App. 46, 52 (793 SE2d 422) (2016); *accord In the Interest of J. C.*, 242 Ga. 737, 738 (1) (251 SE2d 299) (1978); *In the Interest of S. O. C.*, 332 Ga. App. 738, 743 (774 SE2d 785) (2015); *In the Interest of J. V. J.*, 329 Ga. App. 421, 425 (765 SE2d 389) (2014); *In the Interest of C. J. V.*, 323 Ga. App. 283, 283 (746 SE2d 783) (2013); *In the Interest of M. A.*, 280 Ga. App. 854, 856 (635 SE2d 223) (2006).

custody of their children."[9] In this respect, the Supreme Court of the United States has

_____

[9] *Clark v. Wade*, 273 Ga. 587, 596 (IV) (544 SE2d 99) (2001) (plurality opinion); *see Meyer v. Nebraska*, 262 U.S. 390, 399 (43 SCt 625, 67 LEd 1042) (1923) (noting that the liberty interest guaranteed by the Fourteenth Amendment to the United States Constitution includes "freedom . . . to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home[,] and *bring up children*, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men" (emphasis supplied)); *see also Stanley v. Illinois*, 405 U.S. 645, 651 (II) (92 SCt 1208, 31 LE2d 551) (1972) ("The Court has frequently emphasized the importance of family. The rights to conceive and to raise one's children have been deemed essential, basic civil rights of man, and rights far more precious than property rights . . . ." (punctuation & citations omitted)); *Prince*, 321 U. S. at 166 (noting that there is a "private realm of family life which the state cannot enter"); *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (45 SCt 571, 69 LEd 1070) (1925) ("The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."); *In the Interest of M. F.*, 298 Ga. at 144-45 (2) ("The presumption that children ordinarily belong in the care and custody of their parents is not merely a presumption of the statutory and common law, but it has roots in the fundamental constitutional rights of parents. The Constitution secures the fundamental right of parents to direct the upbringing of their children, and it protects a private realm of family life which the state cannot enter without compelling justification." (punctuation & citation omitted)); *Brooks v. Parkerson*, 265 Ga. 189, 191 (2) (a) (454 SE2d 769) (1995) ("The U.S. Supreme Court has long recognized a constitutionally protected interest of parents to raise their children without undue state interference."); *see generally* U.S. Const. amend. IX ("The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others *retained* by the people.") (emphasis supplied)); U.S. Const. amend. XIV, § 1 ("No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States[.]"); Ga. Const. Art. 1, § 1, XXIX ("The enumeration of rights herein contained as part of this Constitution shall not be construed to deny to the people any *inherent rights* which they may have hitherto enjoyed." (emphasis supplied)); Hadley Arkes,

6

acknowledged that "[t]he liberty interest . . . of parents in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests . . . ."[10] And while a parent's right to raise his or her children without state interference is largely expressed as a "liberty" interest, the Supreme Court of the United States has also noted that this natural law right derives from "privacy rights" embedded in the text, structure, and history of the federal constitution.[11]

---

*The Return of George Sutherland: Restoring a Jurisprudence of Natural Rights*, 282-83 (1994) (characterizing the *Meyer* and *Pierce* decisions as containing "the logic of natural rights").

[10] *Troxel v. Granville*, 530 U.S. 57, 65 (II) (120 SCt 2054, 147 LE2d 49) (2000) (plurality opinion); *see id.* at 68 (II) (noting the constitutional presumption that "fit parents act in the best interests of their children"); *Parham v. J. R.*, 442 U.S. 584, 602 (III) (b) (99 SCt 2493, 61 LE2d 101) (1979) (noting that the federal constitution's "concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions," and that "natural bonds of affection lead parents to act in the best interest of their children"); *see also* TUCKER, *supra* at 446 ("The duty of parents to provide for the maintenance of their children is a principle of natural law."); 2 JAMES KENT, COMMENTARIES ON AMERICAN LAW 169 (O. Halsted 1827) (noting that "[t]he rights of parents result from their duties [to their children]," and "the law has given them such authority"); JOHN LOCKE, SECOND TREATISE OF GOVERNMENT, Ch. 6, § 71 (Hackett Publishing Co., Inc. 1980, originally published in 1690) ("This shews the reason how it comes to pass, that *parents in societies*, where they themselves are subjects, retain a *power over their children*, and have as much right to their subjection, as those who are in the state of nature." (emphasis supplied)).

[11] *See Brooks*, 265 Ga. at 191-92 (2) (a); *see also Clark*, 273 Ga. at 606 (Thompson, J., dissenting) ("Under the Due Process Clause of the Fourteenth Amendment, and our state constitution, parents have a fundamental liberty interest

7

In Georgia, a parent's natural right to familial relations is also recognized "under our state constitutional protections of liberty and privacy rights."[12] Indeed, Georgia courts have repeatedly recognized that "the constitutional right to raise one's children is a fiercely guarded right in our society and law, and a right that should be infringed upon only under the most compelling circumstances."[13] In fact, according to our Supreme Court, "there can scarcely be imagined a more fundamental . . . right than the right of a natural parent to [his or her] offspring."[14] And the fundamental liberty interest of natural parents in "the care, custody, and management of their child

---

*and privacy right* in raising their children without undue state influence." (emphasis supplied)); *see, e. g.*, *Prince*, 321 U.S. at 165 (recognizing a parent's authority over rearing his or her children and the right of a parent to control over and training of her child as "sacred private interests" that are "basic in a democracy").

[12] *Brooks*, 265 Ga. at 192 (2) (a). *Cf. Powell v. State*, 270 Ga. 327, 330-31 (3) (510 SE2d 18) (1998) ("[T]he 'right to be let alone' guaranteed by the Georgia Constitution is far more extensive tha[n] the right of privacy protected by the U.S. Constitution, which protects only those matters 'deeply rooted in this Nation's history and tradition' or which are 'implicit in the concept of ordered liberty.'").

[13] *In the Interest of D. M.*, 339 Ga. App. at 52 (punctuation omitted); *accord In the Interest of J. C.*, 242 Ga. at 738 (1); *In the Interest of S. O. C.*, 332 Ga. App. at 743; *In the Interest of J. V. J.*, 329 Ga. App. at 425; *In the Interest of C. J. V.*, 323 Ga. App. at 283; *In the Interest of M. A.*, 280 Ga. App. at 856.

[14] *In the Interest of M. F.*, 298 Ga. at 145 (2) (punctuation omitted); *accord Floyd v. Gibson*, 337 Ga. App. 474, 479 (1) (788 SE2d 84) (2016).

8

does not evaporate simply because they have not been model parents. . . ."[15] To be sure, parental rights are not absolute. But when this fundamental liberty interest is at stake, a court must "give full, fair, and thoughtful consideration to the serious matter at hand."[16]

Here, as explained by the majority, there was essentially no evidence—much less clear and convincing evidence—that V. G. was dependent or his mother was unfit or incapable of caring for him. And by removing V. G. from his mother's custody, the juvenile court essentially penalized her for seeking assistance in providing such care for her child. Needless to say, in granting custody of V. G. to the Department, even temporarily, the juvenile court failed to give the mother's constitutional right to the custody, care, and control of her child the thoughtful and serious consideration it

---

[15] *In the Interest of M. F.*, 298 Ga. at 145 (2); *accord Santosky v. Kramer*, 455 U.S. 745, 753 (II) (102 SCt 1388, 71 LE2d 599) (1982); *In the Interest of S. O. C.*, 332 Ga. App. at 746-47 (3).

[16] *Floyd*, 337 Ga. App. at 479 (1); *accord In the Interest of C. H.*, 343 Ga. App. at 15 (Dillard, C. J., concurring fully and specially).

warrants,[17] as well as the child's reciprocal right to be parented by his biological mother.[18]

I take this opportunity, then, to once again remind our juvenile courts and the State that, in making any decision or taking any action that interferes with a parent-child relationship, our state statutes are subordinate to and must be construed in light of the fundamental rights recognized by the federal and Georgia constitutions.[19] Once

---

[17] *See, e.g.*, *In the Interest of T. Y.*, 350 Ga. App. 553, 559 (829 SE2d 808) (2019) (noting that even a temporary loss of custody is not authorized unless there is clear and convincing evidence that the dependency "resulted from unfitness on the part of the parent, that is, either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child," and that "only under compelling circumstances that are found to exist by such clear and convincing proof may a court sever, even temporarily, the parent-child custodial relationship." (punctuation & citation omitted)).

[18] *See Santosky*, 455 U.S. at 760 (III) (A) ("[U]ntil the state proves parental unfitness, the child and his parents *share* a vital interest in preventing erroneous termination of the natural relationship." (emphasis added)); *D. B. v. Cardall*, 826 F3d 721, 740 (IV) (A) (4th Cir. 2016) ("Just as parents possess a fundamental right with respect to their children, children also enjoy a familial right to be raised and nurtured by their parents." (punctuation omitted)); *Berman v. Young*, 291 F3d 976, 983 (2) (7th Cir. 2002) ("Parents have a fundamental due process right to care for and raise their children, and children enjoy the corresponding familial right to be raised and nurtured by their parents.").

[19] *See, e.g.*, *Borgers v. Borgers*, 347 Ga. App. 640, 645-50 (820 SE2d 474) (2018) (Dillard, C. J., concurring fully and specially); *In the Interest of R. B.*, 346 Ga. App. 564, 571-76 (816 SE2d 706) (2018) (Dillard, C. J., concurring fully and specially); *In Interest of R. S. T.*, 345 Ga. App. at 314-21 (Dillard, C. J., concurring

10

again, and I cannot emphasize this enough, "[t]he constitutional right of familial relations is not provided by government; it preexists government."[20] This "cherished and sacrosanct right" is not "a gift from the sovereign; it is our natural birthright. Fixed. Innate. Unalienable."[21] Thus, regardless of a state actor's personal feelings or perception of a parent's fitness to care for or retain custody of his or her child, careful consideration of these bedrock constitutional principles and safeguards must remain central to each case without exception. And when this fails to occur, as it did here, we

---

fully and specially); *In the Interest of C. H.*, 343 Ga. App. at 13-19 (Dillard, C. J., concurring fully and specially).

[20] *In Interest of E. G. L. B.*, 342 Ga. App. at 848; *accord Borgers*, 347 Ga. App. at 645-46 (820 SE2d 474) (2018) (Dillard, C. J., concurring fully and specially); *In the Interest of R. B.*, 346 Ga. App. at 571-76 (Dillard, C. J., concurring fully and specially); *In the Interest of C. H.*, 343 Ga. App. at 18 (Dillard, C. J., concurring fully and specially); *see In Interest of R. S. T.*, 345 Ga. App. at 315-16 (Dillard, C. J., concurring fully and specially) ("The liberty interest parents have in familial relations with their children is a natural-law right that has been enshrined in our positive law. It is a right that preexists government and one that we retain as a people separate and apart from any statute or constitution." (footnotes & punctuation omitted)).

[21] *In Interest of E. G. L. B.*, 342 Ga. App. at 848 (punctuation omitted); *accord In the Interest of C. H.*, 343 Ga. App. at 18 (Dillard, C. J., concurring fully and specially).

will not hesitate to remind the State[22] and our juvenile courts of the solemn obligation they have to safeguard the parental rights of all Georgians.[23]

---

[22] I pause to make an observation that I hope will be of benefit to the State's attorneys going forward. Many of the State's briefs in dependency and termination-of-parental-rights cases fail to acknowledge the reality of Georgia's dramatically altered jurisprudential landscape. As the State has undoubtedly noticed, we no longer reflexively affirm juvenile court orders. Nevertheless, the State's briefs often overwhelmingly cite to older opinions that failed to seriously consider the parents' constitutional right to familial relations with their children. In the future, it would be helpful if the State took to heart our increasingly frequent reversals of dependency and termination-of-parental-rights orders and submitted briefs that address more recent—*i.e.,* those from the past decade—Georgia appellate opinions.

[23] *See* Garnett, *supra* at 133 (III) ("[S]tate functionaries, guided and restrained by a proper humility about their authority and competence, should meddle with [the parent-child relationship] only to prevent harm, very carefully defined, to a child. That is, they should not intervene simply whenever they think intrusion or oversight would serve the Government's notion of the child's 'best interests' or its own perceived need and claimed prerogative to create a certain kind of citizen . . . *Pierce* [*v. Society of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510 (45 SCt 571, 69 LEd 1070) (1925),] is a rejection of state omnipotence, not children's personhood.").